Argued June 27, 1934; modified January 8, 1935

# SILVER FALLS TIMBER CO. ET AL. *v.* EASTERN & WESTERN LUMBER CO.

(40 P. (2d) 703

*John F. Reilly,* of Portland (Wilson & Reilly, of Portland, on the brief), for appellant.

*Charles A. Hart* and *Omar C. Spencer,* both of Portland (Carey, Hart, Spencer & McCulloch and Veazie & Veazie, all of Portland, on the brief), for respondents.

ROSSMAN, J. The right of the insurance companies, which are ten of the eleven plaintiffs, to maintain this action as co-plaintiffs, in the event the other plaintiff, Silver Falls Timber Company, possesses a cause of action, is not questioned by the defendant. We shall hereafter refer to the Silver Falls Timber Company as the plaintiff and to the Eastern and Western Lumber Company as the defendant.

Since one of the assignments of error is predicated upon an order of the circuit court which overruled the defendant's motion to strike the amended complaint from the files "for the reason that three alleged causes of action are attempted to be stated in said complaint and are not separately stated", or, in the alternative, require the plaintiff to elect "as to whether they will rely upon the allegations of said complaint with reference to alleged common-law negligence, or will rely for their recovery upon violation of the statute with reference to the protection of forest lands in the state of Oregon", it seems desirable at this point to consider the merits of this motion.

Omitting mention of all parts of the complaint which are immaterial to a consideration of the above-mentioned motion, that pleading contains the following averments: The defendant, in conducting its logging operations employed two skidders rigged with lines, blocks and other paraphernalia, and powered by oil-burning steam engines. As a result of the 1928 and 1929 operations "great quantities of slashings were left by defendant upon its said lands * * * and said slashings created and constituted a fire hazard. Defendant was not relieved or excused from the burning

of said slashings by order of any fire warden or otherwise. On September 6, 1929, and for several weeks prior thereto, defendant's Skidder Number 1 was being operated by defendant in its logging operations * * *. By reason of a long-continued drouth prior to said day, the said forest and timberlands and the slashings and debris from defendant's logging operations and the live, dead and fallen timber and other vegetation thereon were dry and highly inflammable. By 11 o'clock of said day, and thereafter until late in the afternoon, a strong east-to-northeasterly wind was blowing across said lands and at the settings of defendant's said skidders where defendant was then logging; and during said time and at the point of and for a radius of many miles surrounding said logging operations the relative humidity of the atmosphere was below thirty per cent. In the operation of said skidders defendant was lifting and dragging heavy fir logs by means of wire cables running at high speed and under severe and varying tension through steel and iron pulleys, blocks and eyes, and by means of chokers, hooks and other appliances of steel through friction and impact of metals such operations often cause heat and sparks sufficient to set fire to forest debris under the condition of dryness, low humidity and exposure to wind which existed at said place of operation from and after 11 o'clock a. m. on said 6th day of September, 1929, and a forest fire once set would under said conditions burn fiercely and spread rapidly; and the continuance of said operations under said conditions involved and produced great and obvious danger that a forest fire would be caused thereby and would spread rapidly and extensively; and defendant well knew of the facts hereinbefore alleged''. Continuing, the complaint alleges that defendant, nevertheless, continued

its operations; and that about 1:30 o'clock p. m. of September 6, 1929, in operating Skidder Number 1, it negligently set fire to the inflammable material adjacent to the skidder. We again quote: "By reason of the failure of defendant to extinguish said fire and defendant's carelessness and negligence in permitting and suffering such fire to burn into and through the forests * * * and by reason of defendant's carelessness and negligence in failing to make every possible effort to extinguish said fire and to prevent the spread thereof, said fire traveled and burned from the place where it had been carelessly and negligently set and started by defendant, as aforesaid, and spread on to and burned over the lands of plaintiff. * * *" The complaint alleges that defendant was negligent in the following particulars: "(1) While engaged in logging the lands under its control * * * it created a fire hazard by the accumulation of slashings resulting from its logging operations on said lands during the years 1928 and 1929, * * * (2) From approximately the middle of the morning until between one and one-thirty in the afternoon of September 6, 1929, defendant operated its logging equipment * * * when, during said time and at said place and in the surrounding country, the temperature was above seventy degrees Fahrenheit, the relative humidity of the atmosphere was below thirty per cent, a strong wind was blowing, and said Skidder Number 1 and all of the surrounding country, including all of the lands under the control of the defendant, were extremely dry and in a highly inflammable condition; * * * (3) Defendant carelessly, recklessly and negligently failed to extinguish or control said fire or to use every possible effort or any reasonable effort so to do * * * and negligently and recklessly failed to make any effort to prevent

the spread of said fire over defendant's lands toward and upon the lands and property of the Silver Falls Timber Company, and negligently and wilfully suffered and permitted said fire to burn uncontrolled over and through defendant's slashings, brush and woods in the direction of, and to reach and burn the property of the Silver Falls Timber Company. (4) Defendant negligently and carelessly failed to provide adequate or any means of protection from, or to prevent the starting of fires by the friction * * * (5) Defendant carelessly and negligently failed and neglected to have the said steam engine on Skidder Number 1 * * * equipped with an efficient steam pump * * * and it negligently and carelessly failed to have said steam engine equipped with not less than two hundred feet of hose one inch or over in diameter * * *. (6) Defendant carelessly, recklessly and negligently failed and refused to prevent the spread of the fire hereinbefore mentioned * * *. (7) Defendant carelessly, recklessly and negligently failed and refused to control said fire and negligently and recklessly failed and neglected to use every possible effort or any reasonable effort to extinguish said fire or to control the same * * *, said defendant having knowledge of said fire then burning on the said lands controlled and in the possession of defendant * * *.'' Further, the complaint alleges that, as a result of the defendant's negligence, the fire spread to the property of the plaintiff, consuming or otherwise damaging the property described in the complaint. The pleading avers that the plaintiff, in endeavoring to prevent the destruction of its property, employed ''a great number of men and furnished them with equipment, materials and supplies, and thereby was compelled to and did incur expenses aggregating $11,283.55; that said expendi-

tures were necessary and reasonable''. Other items of damages mentioned in the complaint constitute the value of timber, bridges, logging equipment, etc., which the complaint alleges were consumed or damaged by the fire. The concluding averment of the complaint states: ''By reason of the facts aforesaid, plaintiffs are entitled to recover from the defendants, Eastern and Western Lumber Company, double the amount of the actual damages sustained through the careless, reckless and negligent acts and omissions of said defendant, as hereinbefore alleged.'' The pleading demands judgment for $1,026,907.24.

In support of its contention that the above pleading states three causes of action, the defendant argues that the complaint avers a cause of action based upon common law negligence; another based upon an alleged failure of the defendant to comply with the Forest Protection Act (§§ 42-401 to 42-434, Oregon Code 1930), and a third in the nature of an action of debt wherein the plaintiff seeks to avail itself of the privilege afforded by § 42-428, Oregon Code 1930, and recover the expenses ($11,283.55) incurred by it in fighting the fire described in the complaint.

The first five sections of the aforementioned act create a State Board of Forestry, define its duties, authorize the appointment of a state forester, fix his salary, define his duties, authorize the forester to appoint wardens, authorize the forester to ''designate suitable areas to be official fire districts'', and to ''appoint for each district one or more district fire wardens''. Section 42-406 provides: ''Any and all inadequately protected forest land covered wholly or in part by inflammable debris or otherwise likely to further the spread of fire, which by reason of its situation or condition or lack of protection endangers life

or property, is hereby declared to be a public nuisance. * · * * '' The rest of this section provides that if the owner fails to provide the necessary protection after ten days' notice from the forester, the latter, or any warden, ''may have such work done as he deems requisite to public safety * * *'', and recover from the owner the expense thereof ''by action for debt''. Section 42-407 directs all wardens to ''take proper steps for the prevention and extinguishment of fires, * * * assist in apprehending and convicting offenders against the fire laws, control the use of fire for clearing land in the closed season. * * * They shall have the power of peace officers to make arrests for violations of forest laws * * *''. Section 42-408 provides: ''Any able-bodied man refusing, without reasonable excuse, to render assistance in suppressing a grass, brush or forest fire when called upon by a regularly appointed state fire warden, shall be guilty of a misdemeanor * * *.'' Section 42-409, before its amendments in 1931 and 1933, designated the period of May 15 to October 1 as a closed season within which ''it shall be unlawful for any one to set on fire, or cause to be set on fire, any forest land * * * without first securing a written or printed permit from the forester or a warden * * *''. Section 42-410 provides: ''Any one who unlawfully sets on fire, or causes to be set on fire, any forest land * * * or who wilfully or negligently allows fires to escape from his own land * * * or any one who accidentally sets any fire on his own land or the land of another and allows it to escape from his control without extinguishing it, or using every possible effort so to do, or who, having knowledge of a fire burning on his own lands, or lands of which he is in possession or control, fails or neglects to make every possible effort to extinguish the same.

regardless of whether or not he is responsible for the start or existence thereof; shall be punished * * *.'' Section 42-411, prior to its amendment in 1933, provided: ''Any fire on any forest land in the state of Oregon burning uncontrolled and/or without proper precaution being taken to prevent its spread, notwithstanding the origin of such fire, is hereby declared a public nuisance by reason of its menace to life and property. The owner or person in possession of land, on which a fire exists, or from which it may have spread, notwithstanding the origin or subsequent spread thereof on his own or other land, is hereby required to make every effort to control and extinguish such fire immediately its existence comes to his knowledge, without awaiting instructions from the forester or a warden, or ranger; and if such owner or person in possession shall refuse, neglect or fail so to do, the forester, or any warden acting under his authority, or any United States forest officer, may summarily abate the nuisance thus constituted * * *; provided, however, that if the owner shall regularly pay a fire patrol assessment on such land and/or is a member in good standing of an organization approved by and under contract with the board, which organization has undertaken the control and suppression of fires on such land, and such organization is actually engaged in the control and suppression of fire entering upon or which may be burning on such land, the owner shall not be liable under section 10 of this act [§ 42-410, Oregon Code] or be held as maintaining a nuisance as defined in this section unless he or his agent shall, through negligence or carelessness, be responsible for the origin of such fire.'' Section 42-412 concerns itself with camp fires. Section 42-413 subjects to a penalty any one who operates a locomotive from May 15 to October 1 within

one-eighth of a mile of any forest land unless the locomotive is provided "with an adequate spark arrester and an ash pan". Section 42-414 provides: "Every one operating any steam engine within the closed season in or within one hundred (100) feet of any inflammable debris on any forest land shall equip such engine with an efficient steam pump or provide a gravity water system therefor, either of which shall be of sufficient size and capacity to give forty (40) pounds pressure on two hundred (200) feet of one-inch hose, and shall also equip such engine or gravity system with not less than two hundred (200) feet of hose one inch or over in diameter * * *." Section 42-415 requires that, from May 1 to October 1, the landings of logging operations be equipped with the tools mentioned in that section. Section 42-416 authorizes the forester to require logging railroads to be equipped with a tank car, pump and 800 feet of hose. Section 42-417 requires all snags, 15 feet in height and standing within 150 feet of any steam engine "setting in any forest land", to be felled. Section 42-418 renders unlawful the operation of a steam engine in the closed season within 150 feet of any forest land, unless the debris in the space 50 feet around the engine is cleared of inflammable material or is kept moist. It also requires the employment of a watchman. Section 42-419 requires all mills which burn their refuse to use safe refuse burners. Section 42-420 provides that those who fail to comply with the requirements of Section 42-414, to and including 42-419, shall be subject to the criminal penalty prescribed in that section. Section 42-421 provides: "Every one * * * engaged in logging * * * thereby creating a fire hazard, shall, unless relieved by the state forester, each year remove such hazard by burning his annual slashing * * * provided, that where only a portion of the

forest crop is removed and in the opinion of the forester such burning is unnecessary, or will create a fire hazard, he may relieve by written authorization such person, firm or corporation from the above requirements * * *. Violations of the provisions of this section shall be punished * * *.'' Section 42-422 requires that ''every one shall, before clearing any right of way for any highway or railroad, or * * * on any forest land * * * where the clearing of such right of way would constitute a fire hazard, file with the forester * * *'' an application and secure a permit. Failure to do so subjects the offender to a penalty. Section 42-424 provides: ''No contract for the construction of any trail, highway or * * * shall be let by the State of Oregon, or any * * * unless the contract shall contain specific provisions'' regulating the manner of clearing designated in this section. Failure to comply with the regulations enumerated in this section in the performance of the work authorizes the forester to provide the needed safety measures at the expense of the responsible parties. Section 42-425 renders felonious the act of any one ''who shall wilfully and maliciously set fire to any forest * * *.'' Section 42-426 provides: ''Any one who shall accidentally set fire to any forest * * * and shall not extinguish the same or use every possible effort so to do, or who shall build any fire for lawful purposes * * * and through carelessness or neglect shall suffer or permit such fire to burn into or through such forest * * * shall be deemed guilty of a misdemeanor * * . *.'' Section 42-427 subjects to a penalty any one who, during the closed season, throws lighted tobacco in any forest land. Section 42-428 provides: ''In addition to the penalties provided in this act, the United States, state, county or private owners whose property is injured or

destroyed by fires in violation of this act may recover in a civil action double the amount of damages suffered if the fires occurred through wilfullness, malice or negligence. Persons, firms or corporations causing fires by violation of this act shall be liable in action for debt to the full amount of all expenses incurred in fighting such fires." The next five sections provide that the informer in any action to recover a penalty shall receive one-half of the fine assessed; that the district attorneys shall prosecute those accused of violation of the act; that any one who wilfully defaces any warning placard posted by the forester shall be subject to a penalty; that counties may make appropriations for the enforcement of the act; and that the courts mentioned in the act shall have jurisdiction over prosecutions instituted under the act. Section 42-434, being the last one, provides that the statutes therein mentioned and "all acts and parts of acts inconsistent with this act hereby are repealed, in so far as the same are in conflict herewith".

It will be observed from the preceding review of the complaint that the plaintiffs charge the defendant with negligence in the following particulars: (1) Failure to destroy its 1928 slashings; (2) failure to provide means for the prevention of friction sparks; (3) failure to equip its skidders with the fire-extinguishing apparatus required by the Forest Protection Act; (4) negligently projecting friction sparks into the dry debris and slashings in which its equipment was operating; (5) operating its equipment at a time when, due to the dryness of the forest materials, it should have suspended operations; and (6) failure to extinguish or control the fire after it had been started. It is evident that the plaintiffs rely upon (1) the common law principle which required the defendant, in the conduct

of its operations, to use reasonable care for the prevention of injury to the property of others; and (2) the provisions of the Forest Protection Act. It is also evident that the plaintiffs believe that the common law principle just mentioned embraces a provision which requires a spark-emitting logging operation to shut down during periods of abnormally low humidity if it can devise no other means of overcoming the attendant fire hazard.

The defendant, in support of the aforementioned motions, contends: (1) That the common law embraces no principle of the character just mentioned; (2) that if the common law ever embraced such a principle it was repealed by the enactment of the Forest Protection Act which makes no mention of it; (3) that if the principle ever existed and has not been repealed a violation of it creates a cause of action separate and apart from the cause of action arising from a violation of the Forest Protection Act in which double damages are recoverable; and (4) that plaintiffs' demand for the recovery of expenses incurred by them in fighting the invading fire is, pursuant to the provisions of Section 42-428, an action of debt and cannot be united with either of the two tort actions.

■ It seems desirable at the outset to determine the provisions of law which are applicable to the facts recited in the complaint. Let us first ascertain whether any principle of the common law requires spark-emitting logging operations to shut down during a period of low humidity which has converted the forest debris into tinder, provided the logger is unable in any other way to overcome the abnormal fire hazard.

The courts, in the application of the common law principle that the person responsible for the condition of a place or the conduct of an industry from which

fire may escape is charged with the duty of taking suitable precautions to avoid such possibility, recognize the fact that drouth and wind materially increase fire hazard. In virtually all fire cases that have come to our attention, the courts, in determining the issue of negligence, received and considered evidence showing the attendant weather conditions. A few of the decisions are collected in the following annotations: 45 A. L. R. 875; 20 Ann. Cas. 699; see also *Lieuallen v. Mosgrove,* 37 Or. 446 (61 P. 1022), and *Louisville N. A. & C. R. Co. v. Nitsche,* 126 Ind. 229 (26 N. E. 51, 22 Am. St. R. 582, 9 L. R. A. 750). From *Lieuallen v. Mosgrove,* supra, we quote:

"The dryness of the season, the proximity to the engine of dry, combustible material, easily ignited, and the probability of a wind coming up, were proper matters to be considered by the jury in determining whether the defendants, under the surrounding circumstances, used the requisite degree of prudence and caution to prevent the fire from communicating to and destroying the adjoining property."

The courts also take note that fires, especially large conflagrations burning in timber, themselves create drafts, winds and whirlwinds which carry sparks and burning embers. An instance is *Mensik v. Cascade Timber Co.,* 144 Wash. 528 (258 P. 323), from which we quote:

"There is also testimony, which accords with common knowledge, that fires themselves create a wind which increases as the fires increase, and that hills and draws act much the same as smokestacks, giving draft to the fire and velocity to the wind."

A recent legislative declaration takes note of the hazards created in forested areas by weather conditions. We quote from the Preamble of chapter 59, 1933 Session Laws (2d Sp. Session).

"Whereas disastrous forest fires in the State of Oregon have resulted not only in vast damage to forest growth, but also in loss of lives; and

"Whereas the most destructive of said fires have been man-caused and therefore were preventable; and

"Whereas during the seasons when there is danger from forest fires use of the forest particularly for industrial purposes is hazardous and adequate forest protection requires extreme care in the use of fire in the forests during said seasons; and

"Whereas during certain days or parts of days during said seasons a combination of adverse weather conditions makes any use of fire in the forests a menace to life and property; * * *''

Where the evidence shows that (1) a defendant's industry or operation emits sparks or fire; (2) the surrounding materials have become highly inflammable, due to drouth conditions; (3) prevailing winds are capable of carrying the emitted sparks or fire to adjoining premises; and (4) a suspension of operations appears to be the only means of avoiding the fire menace, the courts have sustained judgments in behalf of plaintiffs whose property was burned by a fire which emanated from a spark-emitting industry or operation which failed to suspend operations. The following decisions, we believe, justify the statement just made. In *Webster v. Symes,* 109 Mich. 1 (66 N. W. 580), the evidence indicated that the defendant's steam sawmill was located in the same village with the plaintiff's hotel; that, at the time when the hotel was consumed by fire, the atmosphere was dry and a strong wind was blowing with sufficient velocity to carry a spark from the mill to the hotel. The trial court instructed the jury that if they should find "that from the violence of the wind then blowing and the dryness of the atmosphere and the immediate surroundings of the mill and the plaintiff's property * * * that a prudent

man, conversant with the business and the existing conditions, would have shut down said mill until the violence of the wind had abated, the failure of the defendant to do so was negligence''. The judgment in the plaintiff's favor .was affirmed. In *Meier & Lockwood Corp. v. Dakota Live Stock Inv. Co.,* 46 S. D. 397 (193 N. W. 138), the court said: ''It seems clear that the use of a cookstove in a hayfield, where meals for about 25 men were to be cooked and served three times each day, on a stove with so short a pipe, unprotected in any way, which was to be used at a time of year when everything was exceedingly dry and inflammable, and was being so used on a windy day to cook hot meals, under all the circumstances here shown .was in itself evidence properly submitted to a jury on the question of negligence.''

In *Pulliam v. Miller,* 108 Neb. 442 (187 N. W. 925), the defendant set his combined harvester-thresher, operated by a gasoline engine, in a field on premises a quarter of a mile south of the plaintiff's wheat field. The wind, which plaintiff's witnesses described as considerable in volume, was blowing from the south. The stubble was dry and twelve to twenty inches high. A spark from the exhaust set fire to the stubble which spread to the plaintiff's wheat field, consuming it. Referring to the conditions, the court, in sustaining plaintiff's judgment, declared: ''These facts of themselves, it seems to us, are sufficient to establish in the minds of reasonable men that the defendant was negligent in placing a machine of such nature in such an environment. * * * Under ordinary circumstances the smoking of a pipe is not regarded as a negligent act, but the smoking of a pipe in a powder factory would be regarded as negligence in the extreme.''

In *Martin v. Bishop,* 59 Wis. 417 (18 N. W. 337), the plaintiffs had recovered judgment for the destruction of their property by fire against the defendant who operated a threshing machine propelled by steam power. From the decision we quote:

"The machine was properly constructed and was provided with all appliances to prevent the escape of fire which could reasonably be required; hence, the case turns upon the question whether, under the circumstances, it was negligence to start the engine when it was started. The grain was burned in August. The undisputed evidence is that the weather was hot and dry; there was a very high wind blowing from the south at the time, and the engine was set 65 feet south, or perhaps a little southwest of the stacks. The fire caught in the stacks * * *. It seems to us that the jury was abundantly justified in finding that it was negligence to start the engine under such circumstances. The best constructed engine emits some fire, and to put one in operation when standing within four rods of half a dozen stacks of grain, and on the windward side thereof, on a hot, dry day, when the wind was blowing a gale, and when any fire emitted from it would almost inevitably be carried into the stacks or loose straw about them is, it seems to us, not only want of ordinary care but very gross negligence."

From *Collins v. Groseclose,* 40 Ind. 414, wherein the facts were somewhat similar to those just mentioned, we quote:

"If the plaintiff temporarily left the field and whilst he was absent the wind increased so as to render it dangerous to continue the work, and it would so appear to an ordinarily prudent man, it was the duty of appellants to stop; and it was such carelessness for them to continue threshing after that, in the absence of the owner of the wheat, that they ought to be held responsible for the damage resulting from it."

See also *Louisville etc. Co. v. Nitsche,* supra.

In the cases just reviewed it was evident before the fire occurred that a continuance of operations would very likely cause a fire and thereby endanger the neighboring property. In each instance the only means of avoiding the probability was a suspension of operations during the unfavorable weather. These decisions seem to hold that the negligent act was the conduct of operating during the unfavorable weather, but it is obvious that the negligent act was the casting of sparks or fire into the surrounding inflammable materials at a time when the weather conditions plainly foretold the possibility of a disastrous fire. If the operation cannot overcome the fire hazard created by its sparks and abnormal weather, it must shut down until normal weather returns, for no one can rightfully threaten with destruction his neighbor's property. It has even been suggested that if an operation cannot be conducted without subjecting adjoining premises to grave danger of destruction through the communication of fire, the offending business becomes a nuisance: Thompson on the Law of Negligence, § 742, and *Lawton v. Giles*, 90 N. C. 374; but see *O'Day v. Shouvlin*, 104 Ohio St. 519 (136 N. E. 289, 25 A. L. R. 980).

It will be remembered that the complaint avers that the operation of the defendant's swiftly-moving cables, chains, chokers, etc., created friction sparks and projected them into the slashings and forest debris. It also alleges that a large part of the slashings, consisting of tree tops and branches, were more than a year old and that all of them had been converted into tinder by the summer's heat and drouth. It will also be recalled that the complaint avers that a strong wind was blowing; that the humidity was below 30 per cent, and that it was evident that a fire, once started, would burn fiercely and spread rapidly. Thus the facts

before us are comparable to those in the cases above reviewed, with the exception that defendant's operations were of greater magnitude. In the foregoing cases the courts merely applied, in a practical manner, the rule that one in charge of property must exercise such prudence in the use of it that he will not cause others to suffer injury. Hence, if he projects sparks or flames into fields of tinder, especially when a strong wind is blowing, and thereby creates a fire which consumes his neighbor's property, he must respond in damages. The complaint before us, in addition to averring the facts to which we have just drawn attention, alleges that the fire hazard was obvious and was known by the defendant. In substantiation of this statement, we point to the averment of the complaint which, after stating that defendant's operations were projecting sparks into the dry logging refuse, alleges that "the continuance of said operations under the said conditions involved and produced great and obvious danger that a forest fire would be caused thereby and would spread rapidly and extensively; and defendant well knew all of the facts hereinbefore alleged". Thus, it is alleged that defendant's resumption of operations, September 6, 1929, after the noon-hour shutdown, involved not a mere possibility of fire but an obvious probability. Projecting friction sparks into the dry forest materials is similar to casting sparks into the same debris from the stack of a wood-burning donkey engine, or casting a shower of sparks in any other way. Regardless of how it is done, a fire is inevitable. We all know that when a forest fire is started during period of late summer drouth it is virtually impossible to extinguish the resulting conflagration until favorable weather returns. In the meantime, the flames rage over thousands of acres of the state's most val-

uable resource, and not infrequently also consume the buildings of logging camps and of small communities. The decisions above reviewed, and we have found none in conflict with them, authorize the statement that when the defendant found that it could not overcome the imminent fire hazard, attendant upon a continuance of its operations, it should have shut down until the hazard had passed. In failing to do so it pursued a negligent course of conduct. We believe, notwithstanding defendant's strong views to the contrary, that the common-law principle that men must exercise due care to avoid inflicting injury upon others includes corollary rules imposing a duty to shut down a spark-emitting industry during periods of drouth, if that is the only available means of overcoming the fire hazard created by it.

Having concluded that the common law embraces the principle just mentioned, we shall now determine whether it was repealed by implication through the enactment of the Forest Protection Act. That act makes no express mention of a purpose to repeal any provision of the common law, nor does it mention negligence except to provide (1) in § 42-428 that double damages may be recovered by any one whose property is destroyed by fire occasioned through "negligence"; (2) in § 42-411 that membership in a fire patrol association, which has undertaken to fight a fire burning upon a member's forest land, frees him from the liabilities mentioned in that section unless he was responsible for the origin of the fire "through negligence"; and (3) in § 42-410 provides that any one who "negligently" allows a fire to escape is subject to a penalty. The act does not define negligence, and a conclusion is therefore warranted that the legislature expected the courts to apply to the term its common-

law meaning. Since the act subjects any one who is guilty of negligence concerning a fire to a criminal penalty, double damages, and deprives him of a defense which would otherwise be available, an inference is justified that the act was, in part, intended to render more effective the common-law principles of negligence. This inference is strengthened by other provisions of the act. For instance, § 42-406 places in the category of nuisance inadequately protected forest lands containing inflammable debris, and § 42-411 places in the same category uncontrolled fires burning upon similar land. Apparently the author of the act desired to render more certain the recovery of damages in actions against those who tortiously originate fires, and, by penalizing negligent persons with double damages, deter carelessness. It seems evident that the act was not intended to render lawful any conduct which previously was regarded as negligent. Likewise, the act nowhere evidences a purpose to permit greater freedom of conduct upon forest lands. The opposite is plainly manifest. For instance, § 42-409 prescribes a closed season. It also requires those who desire to kindle a fire at the times and places mentioned in that section to first obtain a permit. Section 42-422 prohibits any one from clearing a right of way through forest lands without a permit, and § 42-424 renders it unlawful for any state board or any municipality to contract for the construction of trails, highways, etc., without including in the contract the provisions designated in the act regulating the manner in which such work shall be done.

It is apparent that the purpose of the Forest Protection Act is to provide greater, not less, protection against fire. In order to secure greater protection for this natural resource, the act (1) creates the offices

of forester and warden, and confers upon them authority to administer the act; (2) subjects to permit-regulation much conduct which was previously free from such regulation; for instance, kindling fire in a closed season; (3) exacts from landowners, as statutory duties, many acts which were previously optional; for instance, the annual destruction of slashings; (4) grants authority to the forester and wardens to do whatever is necessary to make forests safe against fire, and to extinguish fires, both at the expense of the owner when he is remiss; (5) specifies precautions which must be taken in the clearing of rights of way; and (6) specifies the equipments which must be provided by those engaged in the logging industry. In order to exact compliance with those provisions, the act prescribes penalties which can be imposed in the criminal courts, and provides that in actions for negligence double damages may be imposed. While the above is by no means a complete summary of the contents of the act, it is enough to indicate its purpose. It is evident that the act was not intended as a codification of the law of negligence, and likewise evident that no part of the act is repugnant to the common-law doctrine of negligence.

It is well established that a legislative enactment which undertakes to provide a complete code of laws upon a particular phase of human conduct, when its purpose so to do is manifest, will be deemed evidence of a legislative intent to repeal the common-law provisions upon the same subject: Sutherland Stat. Const. (2d Ed.), § 294. From *The People v. West Englewood Bank,* 353 Ill. 451 (187 N. E. 525), we quote:

"Repeal of laws by implication is not favored. This is a general proposition which is applicable to all laws, and it is only where there is a clear repugnance be-

tween two laws and the provisions of both cannot be carried into effect that the later law must prevail and the former be considered repealed by implication. (People v. Burke, 313 Ill. 576). It is not enough to justify the inference of repeal of a prior statute that a subsequent statute covers some, or even all, of the questions covered by the former. There must be an irreconcilable repugnancy. (Kizer v. City of Mattoon, 332 Ill. 545). In the present case it seems to us that inasmuch as all authorities agree that the primary purpose of a depositary law is to safeguard the revenues, it is better to say that the law was intended to supplement or add to the security furnished by the rule of the common law than to say that it is repugnant to that rule.''

From *State v. One Ford Automobile,* 151 Ark. 31, (235 S. W. 378), we quote:

''The rule is that statutes should not be held to be in derogation of the common law unless there is an irreconcilable repugnance, or unless the statute itself shows that such was the intention and object of the lawmakers. Wilks v. Slaughter, 49 Ark. 235; Powell v. State, 133 Ark. 477. And where the legislature, by statute, carves out of the common law an offense, making it a statutory offense, there is no implied repeal of the common law with respect to other offenses of the same general character. Power v. State, supra.''

From *Commonwealth v. Barnett,* 196 Ky. 731 (245 S. W. 874):

''The same rules for the interpretation of statutes dealing with acts which were crimes at the common law are also stated in 12 Corpus Juris, 186-187, and volume 16 of the same work, page 67. In the first reference the text says: 'The common law is impliedly repealed by a statute which is inconsistent therewith, or which undertakes to revise and cover the whole subject-matter. The common law is not repealed, however, if there is no repugnancy between it and the

statute, and it does not appear that the legislature intended to cover the whole subject. It is a maxim of the common law that a statute made in the affirmative, without any negative, express or implied, does not take away the common law.' "

See also *Knox v. Abrams,* 132 Or. 500 (286 P. 517).

As already stated, the Forest Protection Act is not repugnant to the common law principle of negligence. The statute contains no intimation of any purpose to repeal that principle or to render it less effective. The requirements of the act and the common law requirement that loggers must exercise due care for the prevention of fire, far from being incompatible, are in complete accord. The statute coerces the exercise of due care by subjecting all negligent persons to double damages. It is, therefore, evident that the act does not repeal the requirement that men must exercise due care, but adopts it. We conclude that the act has not repealed the common-law principle upon which the plaintiffs rely.

■ We come now to the question of whether the complaint avers the three causes of action suggested by the defendant: (1) An action based upon negligence; (2) an action for a penalty based upon the statute; and (3) an action in debt. In support of its contention that the complaint contains more than one cause of action, the defendant cites *Portland v. Baker,* 107 Or. 28 (212 P. 967); *Harvey v. Southern Pacific Co.,* 46 Or. 505 (80 P. 1061); *Missouri-Pacific R. Co. v. Ault,* 256 U. S. 554 (65 L. Ed. 1087, 41 S. Ct. 593); *Daniels v. Booker,* 23 Ga. App. 644 (99 S. E. 228); *White Auto Co. v. Dorsey,* 119 Md. 251 (86 Atl. 617). The first two cited decisions we have again read, and the others we have studied carefully. We believe, however, that there is no occasion for discussing the matter at length

once more, for the principles, which dispose of the portion of the motion which would compel an election between the common-law averments and those which are based upon the statute, are plainly stated in *Hoag v. Washington-Oregon Corp.*, 75 Or. 588 (144 P. 574, 147 P. 756), from which we quote:

"In common with all the Code states, our statute (Section 67, L. O. L.) requires a complaint shall contain 'a plain and concise statement of the facts constituting the cause of action.' A 'cause of action' comprehends two elements: (1) A legal right on the part of the plaintiff; and (2) a breach of a corresponding duty on the part of the defendant to accord that right: Pomeroy's Re., § 452; Words and Phrases, tit. 'Cause of Action.' From this definition it follows necessarily, that all breaches of legal duty arising out of one transaction, whether flowing from common law or from the statute constitute but one cause of action, unless the statutory remedy is so inconsistent with the common law remedy that the same judgment could not be rendered upon recovery. In such instances the plaintiff may be required to elect upon which cause of action he will proceed. Thus, in Harvey v. Southern Pac. Co., 46 Or. 505 (80 Pac. 1061), the plaintiff brought an action for the killing of stock upon a railroad track, and in his complaint set up in a single count facts showing a right of recovery at common law, where the measure of damages is the value of the animals injured, and a right of recovery under the statute which gave, under certain circumstances, triple damages for a like injury. It was held that he might have been required to elect upon which cause he would proceed, but that, the defendant having failed to move for the court to compel such election on the trial, he could not afterward raise the objection. The reason for this holding is apparent, because, if a jury should return a general verdict, the court would be unable to determine whether to assess triple damages or to enter judgment for the amount found in the verdict."

 The defendant's duty to the plaintiff was governed, in part by the common law principle of negligence, and, in part, by the statute. But the failure to equip the engines with 200 feet of hose, the failure to destroy in 1928 that year's slashings, and the failure to shut down, violated only one right which the plaintiff possessed; that is, that its property should not be destroyed through the neglect of the defendant to use the required degree of care. Likewise, when the defendant omitted obedience to these common-law and statutory duties it violated only one primary duty which it owed to the plaintiff; that is, that it exercise the required degree of care for the plaintiff's security. Accordingly, it must be true that, when this single right possessed by the plaintiff was violated by the defendant's breach of its single duty owed to the plaintiff, only a single cause of action was created: *Payne v. New York S. & W. R. Co.,* 201 N. Y. 436 (95 N. E. 19); *Baltimore S. S. Co. v. Phillips,* 274 U. S. 316 (47 S. Ct. 600, 71 L. Ed. 1069); 4 Bancroft, Code Pleading, § 2043. The plaintiffs were not at liberty to split this cause of action and thus endeavor to make more than one out of it. Had they omitted from their complaint all of the specifications of negligence concerning defendant's alleged duty to suspend operations, and upon the trial lost the action, they could not have filed a new complaint averring the omitted charges. It is evident that the plaintiff had but a single cause of action: *Jarrett v. Apple,* 31 Kan. 693 (3 P. 571). We have not overlooked the fact that the statute permits the recovery of double damages, but double damages are recoverable not only for breaches of the statutory duty but also for breach of the common law duty. It will be recalled, however, that section 42-428, Oregon Code 1930, provides that any person who violates the act and thereby causes a fire shall be liable "in action for debt to the full

amount of all expenses incurred in fighting such fires''. The defendant insists that a prayer for such expense money converts that part of the action into one of debt. The expenses incurred in protecting property from an invading fire caused by another's negligence have been recoverable in the past without the assistance of any statutory enactments, these being deemed merely items of recoverable damages: Sutherland, Damages, (4th Ed.) § 88. If defendant's contention is correct, the common-law action of debt, abolished in 1862 by the enactment of what is now section 1-601, Oregon Code 1930, has been revived. Moreover, plaintiffs' cause of action has been split in two, and this is a strange result for a statute which seeks to facilitate the recovery of damages by those whose property is burned by tortious fires. But, we believe that defendant's interpretation of this provision of the statute is a mistake. The word ''debt'' has a variety of meanings, only one of which is the purely technical meaning upon which the defendant relies. In its popular sense the word ''debt'' denotes dues and liabilities of infinite variety: 17 C. J., Debt, p. 1471. We believe that the legislature used this term in its popular sense and intended to provide that the sums expended become a liability which the wrong-doer can be compelled to pay. We are, therefore, of the opinion that these expenses constituted an item of damages which were recoverable in this action.

Disposing of this assignment of error, we state our conclusion that the complaint alleges only a single cause of action, and that, therefore, the motion was properly denied. We add, however, at the beginning of the trial the plaintiffs waived their claim for double damages. Apparently no difficulty was experienced in the course of the trial arising from the manner in which the plaintiffs set forth their demand. It is thus

doubly apparent that this assignment of error discloses no merit: Section 1-911, Oregon Code 1930.

The above disposes of the assignments of error which are based on the pleadings. The next three assignments of error which we shall consider are predicated upon the action of the circuit court in overruling the defendant's objections to the admissibility of three items of evidence. The first item of evidence was the testimony of four witnesses: Mills, Gerlinger, Olin and Christenson, who stated the practice of loggers who employ skidders and two-speed donkey engines during periods of low humidity. The second item was two humidity charts, and the third was the testimony of a witness that notice of low humidity was given to loggers.

■ We shall now consider the second of these three assignments of error. The defendant, in support of its contention that the humidity charts were not admissible in evidence, contends: ''These records were too inexact and made at places too far from defendant's property to form any true index of humidity conditions on defendant's property * * *. Unofficial reports not required to be kept by law and not kept by the witness are not admissible in evidence.''

It will be recalled that the complaint alleges that on and prior to September 6, 1929, there had been ''a long-continued drouth''; that the forest, slashings and debris ''were dry and highly inflammable''; that by 11 a. m., on September 6, 1929, the relative humidity ''was below 30 per cent''; that a strong east-to-northeasterly wind was blowing; that the defendant's operations created friction sparks capable of igniting fires; and that the continuance of the operations at that time ''involved and produced great and obvious danger that a forest fire would be caused''.

The weather bureau officials referred to the charts with which we are now concerned as hygrothermograms. They were made by hygrothermographs. The instrument which made one of them was located at North Fork Ranger Station, eight miles north of the defendant's logging camp, and the other instrument was located at the plaintiff's camp, five miles southeast of the defendant's camp. The North Fork instrument made a chart which records the humidity conditions for the period, May 6, 1929, to October 7, 1929, and the other made a chart of humidity conditions during the week ending September 9, 1929.

The plaintiff's camp, the defendant's camp, and North Fork are located upon the western slope of the Cascade mountains, and each is in the vicinity of a small stream. The only substantial difference between the three places disclosed by the record is that of elevation. The elevation at North Fork is 1,280 feet, at the plaintiff's camp is 3,400 feet, and at Skidder Number 1 at the defendant's camp, is 2,900 feet. C. I. Dague, meteorologist of the Portland Weather Bureau, testified that hygrothermographs and the records produced by them are used by the United States Weather Bureau in fire prevention work. He also testified that hygrothermographs are accurate "within close limits.
* * * The instrument itself should register within four or five per cent check reading". According to the testimony, weather bureau officials periodically test the accuracy of hygrothermographs by comparing their readings with sling psychrometers, an instrument which is known to be accurate but which does not record humidity conditions. When an inaccuracy is discovered the official makes the needed adjustment. A. P. Ryan, employe of the plaintiff, was entrusted with the custody of its hygrothermograph. He testified

that each day when he took its reading he checked its accuracy with a sling psychrometer, and that in periods of low humidity he made tests more frequently. When he discovered a discrepancy between the records produced by the hygrothermograph and the readings of the sling psychrometer, he adjusted the hygrothermograph in the manner that Dague had directed. W. B. Osborne, specialist in forest fire prevention work, testified: "The relative humidity in all our west side country should be the same with the exception of the area closely adjacent to the coast." He explained that variations in readings are due to (1) differences in elevation; (2) differences in temperature; or (3) the fact that one instrument is located near a body of water or green timber and the other in a logged-off area. According to Osborne, "there would have to be quite a pronounced difference in elevation to make very great difference in the humidity", and after adding that the difference would have to be about 1,500 feet, expressed the belief "when it was low at one locality it would be almost certain to be low at the other". In 1930 (the year after the fire) the defendant installed an instrument at its camp. The following is a comparison of the readings at the three points:

| | North Fork | Defendant's Camp | Plaintiff's Camp |
|---|---|---|---|
| Sept. 1, 1930 | 19 | 25 | 22 |
| Sept. 2, 1930 | 10 | 22 | 17 |
| Sept. 3, 1930 | 32 | 35 | 25 |
| Sept. 4, 1930 | 53 | 65 | 56 |
| Sept. 5, 1930 | 78 | 58 | 49 |
| Sept. 6, 1930 | 43 | 54 | 57 |
| Sept. 7, 1930 | 57 | 72 | 51 |
| Sept. 8, 1930 | 40 | 62 | 49 |
| Sept. 9, 1930 | 51 | 67 | 63 |
| Sept. 10, 1930 | 100 | 96 | 90 |

A comparison of the readings for the month of August, 1930, discloses a somewhat similar situation. In those two months, according to the record made by the instruments, the humidity at the defendant's camp was generally higher than at the other two points. But in 1931 the locations of the instruments at the plaintiff's and at the defendant's camps were changed and thereafter the humidity record was higher at the defendant's camp than at North Fork, but lower than at the plaintiff's. The comparison, however, indicates that there was substantially the same movement of humidity up or down at all three places and that whenever it was in the vicinity of 30 per cent at one place the same conditions prevailed at the other two places.

As previously stated, no hygrothermograph was maintained at the defendant's camp in 1929, and no one kept a record of humidity there. Of the various hygrothermographs in western Oregon the machines maintained at North Fork and at the plaintiff's camp were the nearest to the defendant's property. Records made at several other places were produced at the trial, and their general trend is the same as that indicated by the records which we have already mentioned.

The hygrothermogram made at the North Fork Station indicates that on September 6, 1929, at 9 a. m., the humidity was 22 per cent, and that from that point on there was a steady decline until it reached 15 per cent at 1 p. m. The chart produced by the plaintiff's machine indicated a humidity percentage of 30 on September 6 at 9 a. m. and a steady decline until 24 was reached at 1 p. m. In August, 1929, according to the North Fork instrument, the humidity dropped to 35 per cent or lower in the following periods: 6th to

8th, 10th to 13th, 16th to 20th, and the 27th to the 30th. These low periods ranged from an hour and fifteen minutes to six hours and thirty minutes. September 3, 1929, the humidity at North Fork remained at 35 per cent or lower for 12 hours, September 4 for 10 hours, 40 minutes, and on September 5 for 8 hours. September 6 the humidity was 25 per cent at 1 a. m., and constantly declined until it reached the percentages mentioned above. Its low point for the day was at 2 p. m. when 14 per cent was recorded. The machine kept at the plaintiff's camp recorded conditions substantially similar for the period of time just mentioned. Osborne testified that those who have studied the fire hazard in forest lands "have established tentatively 35, a relative humidity of 35, as reaching the semi-dangerous point. * * * We recognize in the west side country that two or three hours of a humidity below 35 that things are getting in a rather dangerous, in a rather inflammable condition, and then from there on it is just a matter of relativity; the lower the humidity goes, the dryer the material will be. * * * Ten hours of continuous humidity below 35 per cent, for ten consecutive hours, would represent a very dangerous condition". The same witness explained that a cubic foot of air at a temperature of 65 degrees Fahrenheit has a capacity for holding 7.4 grains of moisture, but that at 90 degrees its capacity is doubled. He testified that the inflammability of the forest materials on which fires feed responds very rapidly to fluctuations of humidity; that when the humidity is low the air "has a maximum absorbing power and it absorbs moisture from all the materials it comes in contact with". He explained that "the top film or the duff of a forest floor" responds more rapidly to humidity fluctuations than the heavier materials,

but that the outer film of a log, which he declared was the important part in fire hazards, also responds readily to fluctuations of humidity. Dague testified that "35 or 30 is a recognized point of humidity whereby conditions become critical". According to Osborne, hygrothermographs have been used by the federal weather bureau in fire protection work since 1922 or 1923.

Without reviewing further the testimony concerning humidity and the nature of the records produced automatically by these scientific instruments, let us determine whether the records were inadmissible merely because (1) they were not made at defendant's camp, and (2) the altitude at the latter point was not the same as at the other two places.

In *Willis v. Lance,* 28 Or. 371 (43 P. 384 487), this court held that the wind records of the United States Weather Bureau, located in Portland, made by an automatic register, were admissible in evidence for the purpose of showing the probable weather conditions at the place where the fire occurred "several miles distant" from Portland. The decision stated that the jury "must have known that obstacles such as hills, mountains and canyons" between Portland and the place where the fire occurred would have to be considered in determining the effect to be attached to the record. It also pointed out that the weather record "is not regarded as verity except at the station where taken, and becomes useful to great areas of territory only when compared with observations taken at other stations." In *Mears v. New York, N. H. & H. R. Co.,* 75 Conn. 171 (52 Atl. 610, 56 L. R. A. 884, 96 Am. St. Rep. 192), the court sustained a ruling receiving in evidence United States Weather Bureau records at Boston, ten miles distant from Waltham, the

place where the alleged tortious act had occurred. We quote from the decision: "There was no weather bureau at Waltham and none as near to it as that of Boston. * * * The objection of remoteness went simply to their weight." In *Huston v. Council Bluffs,* 101 Iowa 33 (69 N. W. 1130, 36 L. R. A. 211), the court approved the ruling of the trial judge in receiving in evidence United States Weather Bureau records kept at Omaha, four and one-half miles from the scene of the accident, declaring that they were admissible "for the purpose of showing the temperature and snowfall during the time it purported to cover". In *Hart v. Walker,* 100 Mich. 406 (59 N. W. 174), the decision affirmed the admissibility of temperature records taken at a point twelve miles distant. The defendant calls to our attention *Southern Utilities Co. v. Murdock,* 99 Fla. 1086 (128 So. 430), wherein the court affirmed the ruling of the trial judge holding that the records of the United States Weather Bureau kept at Tampa were inadmissible to show the velocity of the wind at Manatee thirty or forty miles distant. It expressed the belief that no reliable conclusion could be drawn that the condition of the wind at the two places was the same, and that remoteness was an issue for determination by the trial court's discretion.

We discover no lack of harmony between these decisions. In the Florida case the difference in conditions likely to affect wind velocity between Tampa, located on a bay, and Manatee, located on a small river, was so apparent that the supreme court refused to disturb the trial judge's ruling excluding the weather bureau record. As previously stated, the only substantial difference between the three points affecting humidity is the difference in elevation. North Fork is 1,620 feet lower, and the plaintiff's camp 500 feet

higher, than the defendant's camp. This knowledge affords us a basis for making allowances in the use of the data comprising the charts. Of further assistance is the data gathered at other points in the vicinity of these three places, and also the testimony of the two experts, Osborne and Dague. We also know from the testimony of the lay witnesses that the atmosphere at defendant's camp was actually dry and warm on September 6 and for several weeks previously, with the exception of two rains. We also know from our own daily experiences that atmospheric conditions vary. Fog may be present at one point and absent at another, just as we observe at times clouds in one part of the sky but none in another. But North Fork is only 13 miles distant from the plaintiff's camp, with the defendant's camp between the two. Aided by the large amount of explanatory testimony, we believe that the trial judge should have been able to employ the information recorded upon these charts to advantage in determining the humidity at defendant's camp on the day of the fire, even though the one instrument was five miles and the other eight miles away from defendant's camp. The difference of space was, therefore, an insufficient circumstance to warrant the exclusion of the charts.

■ The defendant next calls our attention to those portions of the testimony which indicate that hygrothermographs may develop an inaccuracy of four or five points, and that the instruments are capable of being adjusted. The fact that they are capable of adjustment apparently leads the defendant to believe that the plaintiff wrongfully manipulated its instrument. We dismiss the latter suggestion with the statement that defendant presented no proof in support of this suspicion. Moreover, every scientific instru-

ment is capable of wrongful use. As is indicated in the preceding review of the testimony, weather bureau officials examined these hygrothermographs at least once a year and made the necessary adjustments when an inaccuracy was discovered. In addition, Ryan, the employee in charge of plaintiff's instrument, compared the records of that machine once each day with the readings of a sling psychrometer and if an inaccuracy was discovered made the needed adjustment. But if an inaccuracy of four or five points existed on September 6, 1929, the humidity at the defendant's camp would, nevertheless, approximate 30 per cent because at 1 p. m. on that day the instrument at North Fork registered 15 per cent, and the one at plaintiff's camp (500 feet higher than defendant's) registered 25 per cent. Corroborating the records made by these instruments is the testimony of the lay witnesses that on September 6, and for many days preceding it, the weather was actually dry and warm. We believe that no inaccuracy in the instruments of serious proportions has been disclosed, and that, therefore, this contention of the defendant lacks merit.

■ Defendant's next objection to the admission of these records is its contention that they were "unofficial reports" and that those who supervised their production were not required to do so. Ryan, the plaintiff's bookkeeper, had charge of the plaintiff's machine. J. W. Ferguson, deputy forester for the state of Oregon, in charge of Clackamas and Marion counties, and who was also supervisor for the Clackamas and Marion Counties Fire Patrol Association, of which both the plaintiff and the defendant were members, supervised the operation of the hygrothermograph located at North Fork. Each identified the hygrothermograms produced by the instrument in his

charge. Each also testified that weekly, when the hygrothermogram was taken from the machine, he sent it to Dague, the meteorologist in the Portland Weather Bureau, in compliance with the latter's request. As previously seen, the record contains testimony proving the accuracy of the machines.

When the accuracy of any automatic recording device had been proved, the records which it produces are admissible in evidence: Wigmore on Evidence (2d Ed.) § 789. In *Willis v. Lance,* 28 Or. 371 (43 P. 384, 487), this court sustained the ruling of the circuit court receiving in evidence the record produced by an automatic wind registering machine. In *State v. Mc-Daniel,* 39 Or. 161 (65 P. 520), the admissibility of the record made by an automatic fire alarm recording device was sustained. In *Northwest Door Co. v. Lewis Inv. Co.,* 92 Or. 186 (180 P. 495), and *Maynard v. Oregon R. R. Co.,* 46 Or. 15 (78 P. 983, 68 L. R. A. 477), this court took the commonplace action of sustaining the admissibility of photographs. In *Jones v. Sinsheimer,* 107 Or. 491 (214 P. 375), and *Yarbrough v. Carlson,* 102 Or. 422 (202 P. 739), the admissibility of X-ray photographs was sustained. The admissibility of speedometer readings has been affirmed. See Huddy Cyc. of Automobile Law, § 186. In Wigmore on Evidence, 1934 Suppl., § 999, the records produced by and the results obtained from many new devices are discussed.

The competency of neither Ryan nor Ferguson to handle the instruments is questioned by the defendant, and it seems self-evident that the fact that they were not employees of the federal weather bureau should not affect the admissibility of the records produced by the machines. In the following instances the individual who made the meteorological record was a volunteer; nevertheless, the records were received in

evidence: *Knott v. Raleigh & G. R. Co.*, 98 N. C. 73, (3 S. E. 735, 2 Am. St. Rep. 321); *Hart v. Walker*, 100 Mich. 406 (59 N. W. 174); *DeArmond v. Neasmith*, 32 Mich. 231.

In the three cases last mentioned the observer himself recorded what he saw, but in the present instance the records were not man-made but machine-made. Their admissibility is not dependent, as the parties seem to believe, upon proof showing that they are regular entries made in the course of duty, nor that they are records of past recollections. They are, in effect, footprints of the humidity made by the atmosphere itself. We are satisfied that their admissibility was not dependent upon the official status or lack of it of the machines' keepers but upon the testimony of the witnesses, scientific and otherwise, who have vouched for the accuracy of the hygrothermographs. The admissibility of the testimony of one who looks at a clock and observes the hours of day is not dependent upon whether he is a weather bureau official whose duty required him to take the look but upon the accuracy of the clock. Since the supporting testimony was given, we are satisfied that the records produced by these machines were properly received in evidence, and that this assignment of error discloses no merit.

■ As we have seen, Ryan and Ferguson each week sent the hygrothermograms produced by their instruments to Dague of the Portland Weather Bureau. The latter had testified that his bureau had effected an arrangement with fire wardens and fire patrol associations whereby the charts produced by their instruments were regularly sent to the Portland Weather Bureau. He further testified that the bureau used these hygrothermograms in the compilation of printed reports which were distributed to fire patrol associa-

tions, logging operators and others. He produced one of these printed reports at the trial, and, as he testified concerning the fire hazard attendant upon low humidity, read from it the humidity at North Fork and the plaintiff's camp. But the data which he read was none other than that recorded in the hygrothermograms of Ryan and Ferguson. His printed compilation was not received in evidence, but was rendered available to defendant for cross-examination. As we have seen, all of the supporting data of Dague's compilation was before the court and likewise Ryan and Ferguson were extensively cross-examined. The method adopted concerning Dague's readings merely facilitated the narration of this testimony and avoided extended delays which would have arisen had he been compelled to examine the hygrothermograms. Expedients of this character, devised for the purpose of facilitating the progress of the trial, rest in the discretion of the trial judge, and, since the employment of this method did not inject into the record any inadmissible data, no error has been disclosed.

■ We come now to a consideration of the assignments of error based upon the rulings which permitted Mills, Gerlinger, Olin and Christenson to testify that logging operations which employ modern high-speed equipment suspend operations at times of abnormal fire hazard. Before this testimony was received, much of the evidence aforementioned, and all of that which we shall now state, had been given.

Three of defendant's employees testified that they were working only a few feet from the place where the fire started in Section 32, Township 7 South, Range 3 East, and that just before they saw it some of the defendant's power-driven chains, cables and hooks had

passed over that spot. One of these expressed the opinion that the fire "could have been caused when the two hooks came together or when the butt-rigging hit the bicycle". Others gave similar testimony. "Bicycle" is a term used by loggers to describe a part of their equipment. Those present at the inception of the fire swore that when it was first observed it was so small that a hat could have covered it, and that they at once leaped upon it, trying unsuccessfully to kick it out. According to them, this small fire grew so rapidly that when men, equipped with shovels and other fire-fighting apparatus, reached it in a moment, it had spread more than a hundred feet. The fire started near the center of 800 acres of 1929 slashings. About a mile to the west were 400 acres of 1928 slashings which were reached by the fire not more than an hour after its start. One of the witnesses testified that when the fire got into the 1928 slashings "it just seemed to explode and it went something fierce then". Others gave similar testimony. Several testified that September 6 was a hot, dry day; that the dead needles, brush, slashings and other material upon the ground were very dry; that a breeze was blowing from the east, and that after the fire had started it created a draft and wind of its own. The fire warden located at the defendant's logging camp about a mile from the spot where the fire began, testified: "The weather was very warm and dry with an east wind blowing and a very low humidity." He added that for several days immediately preceding the fire: "We had a hard, dry east wind." In the period of August 1 to September 6 rain fell twice, but one of the showers was light. Those of the plaintiff's witnesses who expressed an opinion described the summer of 1929 as being abnormal in its dryness, the length of low humidity

periods and the fire hazard arising therefrom. Mills, Gerlinger, Olin and Christenson, who are the executive heads of companies engaged in logging and lumber manufacture in western Oregon, and each of whom had been engaged in the industry for 18 years or more, testified that logging operations which employ high-speed equipment consisting of skidders, two-speed donkeys, or both, are classified separately from those which employ one-speed donkeys, horses or manpower. The defendant operated two skidders. A skidder, which costs approximately $75,000, consists of an engine, cables, bicycle, haul lines and a large steel spar. This spar stands upon a railway car from which a cable runs to another spar standing in the midst of the felled trees. The skidder brings the logs to the railroad. According to these four witnesses, as well as the testimony of others, logging operations which yearly bring in the larger quantities of logs employ either skidders, two-speed donkeys or both. Due to the high speed with which the cables, chokers, hooks, chains, etc., of these larger concerns operate, more friction sparks are created than by the equipment of the smaller operators. Mills estimated that in western Oregon, in 1929, 200 or more logging concerns were operating, and that 15 of these employed high-speed equipment. He professed familiarity with the practice of only the 15 large outfits. He testified, over the defendant's objections: "The general practice by the average operation was to shut down when the humidity was under 30 degrees. That was the requirements of the insurance pool and most were insured. We who were not followed the same regulation." It appears that insurance companies allowed a reduced rate to loggers who agreed to suspend operations when the humidity went to 30 per cent or lower.

Gerlinger, who, in addition to being the president of the Willamette Valley Lumber Company, was also a member of the State Board of Forestry, referred to the concerns operating with high-speed equipment as the "standard operations". These operations, he testified, produce greater fire hazards, explaining: "The greater friction risk of high speed in lines and chokers and chains and different parts that come in contact with either a log or in contact with other metal or contact between two lines, is much more apt to cause sparks and result in flash fires, and result in fires, than the old-time slow operations that didn't have the same speed and didn't have the same friction." Concerning these operations, he testified, over defendant's objection: "The practice prevailing in what I would call standard operations, the predominating practice, the very large predominating practice, I believe, was to observe humidity conditions and close the operations during low humidity periods. Some operations did that because of the penalties involved through insurance and others would do it voluntarily for their own protection. There might be varying causes. But those who are familiar with the risk of operating under low humidity conditions would certainly soon learn to observe them. * * * The generally recognized point is 30 degrees of humidity." He explained that he first obtained knowledge of the practice in 1917, and that in 1926 or 1927 his plant installed a humidity machine, prior to which it had depended upon information furnished by the United States Weather Bureau or through the logging association to which the company belonged. Olin testified that he was not posted on the practices of the smaller outfits, but that he was familiar with the practices of the loggers employing high-speed equipment. Over

defendant's objection, he described their practice in the following answer: "Prevailing custom for a number of years past, seven, eight, or nine, would be to close operations at low relative humidity—say the humidity is 35, say we commenced to—why, we commenced to watch it closely. If it goes down to 30 we became very much concerned. If it goes substantially below that we aim to close unless other conditions in the camp would be such that the danger of a fire would not be very great." His plant maintained a sling psychrometer and received information concerning weather conditions from the weather bureau, the forestry service and the fire wardens. Christenson, over objection, testified that the practice of loggers who employ modern equipment was the following: "The practice was, with low humidity and hot weather, and with winds, it is good practice to close down; that is, we thought it was good practice to close down. * * * Well, we aim to close down, or it is general practice to close down when the humidity was bordering on 30." Upon cross-examination, he answered in the affirmative a question which inquired: "You say your idea is that when you have low humidity, plus hot weather, plus wind, then you think it is the practice to shut down?" Adding significance to the testimony of these four witnesses is the following answer which was given by Fay Abrams, a witness called by the defendant. After he had testified that the operations of which he was the superintendent did not suspend when the humidity declined to any particular point, the presiding judge asked him whether he was aware of a practice observed by the "so-called standard operators to shut down when the humidity reaches a certain low degree" to which he replied: "Well, my understanding is that there is a number of them that do it,

and when the humidity gets to 30 I have been told by a number of operators that they might stop. Other operators work early morning and the forepart of the day so as to avoid that. They start early and quit early." Abrams, like defendant's other humidity witnesses, operated skidders or two-speed donkeys. O. R. Miller, another witness called by the defendant for the purpose of refuting the existence of the alleged practice, answered in the negative a question which inquired whether his company made a practice of closing "when the humidity gets below 30", but, upon cross-examination, replied: "I knew, of course, that some loggers did that. I am not qualified to say how general that practice was." C. G. Kinney, another of defendant's witnesses, likewise called for the purpose of refuting the alleged practice, answered the same question by saying: "Not a strict rule." Upon cross-examination, he was asked whether he was familiar with the alleged practice and replied: "I have never checked on that at all so I have no basis of information." The last of defendant's witnesses on this subject was Henry Lanagan. He testified that he was logging superintendent for the concern of which Mills (plaintiff's witness) was president, and that the company's practice in 1929 was as follows: "Well, we used our own judgment when it came to shutting down, if it got below 30 * * * well, by being careful, if it got too low we would work until noon time and go in and if it wasn't too bad we would stay out." A. McEachern, the logging superintendent of the defendant, as a witness for the latter, testified upon many subjects, but was not questioned concerning this alleged logging practice, and while he stated that on September 6, 1929, conditions were normal concerning fire hazard, made no denial that low humidity increased the fire risk. Likewise, neither

he nor any other witness, denied that skidders and two-speed donkeys produce a greater fire hazard than other methods of logging. H. R. Irish, plaintiff's superintendent, testified that "the practice was to shut down, exercise great care when the humidity dropped below 35, and to cease operations if it remained at 30 or below for any period, an hour or two hours time". September 6 plaintiff suspended its logging operations at 10 a. m., but its logging trains continued to operate.

Without quoting further from the testimony, we state our conclusion that the testimony does not support defendant's contention that shutdowns during periods of low humidity were due to insurance policy demands, but negatives that contention. It may be that the fire insurance companies fostered the practice, but the testimony of Gerlinger and of others indicates that the practice was pursued by the majority of loggers because of its merits.

We do not believe that the evidence in support of the practice must prove an industrial course of conduct of the age and universality of a custom. A custom of venerable age and universality has the effect of a law, but an industrial practice is not invoked in instances of this kind to prove what was lawful or unlawful but to reveal the industry's attitude toward the criticized act. Industrial practices, of necessity, change frequently and only in the plant of the laggard achieve the antiquity which will qualify them as a custom. Likewise, they cannot very well achieve universality because the vanguard is always quick to adopt new methods. But in most instances a generally accepted practice exists which reveals the industry's attitude toward an act or item of conduct which is now the subject of attack. If the evidence discloses that such a practice

actually exists a foundation has been laid for the receipt of the desired testimony. We quote from *Fritz v. Western Union Telegraph Co.*, 25 Utah 263 (71 P. 209):

"Appellants further complain that error was committed in permitting witnesses to answer as to the ordinary and usual method existing among telegraph or telephone companies in regard to providing insulators, and as to the number of wires that should be strung at any one time. The reason assigned for appellants' objection is that it is an improper and insufficient manner to prove the existence of a custom in this respect. We do not think that either the questions or answers objected to contained anything which even tended to show a purpose upon the part of respondent to prove the existence of any custom, or to bind the defendants by its existence. While it is true that the word 'usage,' 'usual,' 'custom,' or 'ordinary,' is used, yet it is quite apparent that the only object of the inquiry was to inform the jury as to the ordinary manner in which such work is performed, and from such testimony determine whether or not defendants were or were not guilty of negligence."

The mere fact, therefore, that the testimony of these four witnesses did not prove a custom was no reason for excluding it. Nor do we believe that the testimony was inadmissible merely because the practice was employed by one element of the logging industry only. The witnesses clearly pointed out the reason a different course of conduct was pursued by these fifteen or so major outfits, which is that their swiftly-moving equipment created greater fire hazard than that of the others.

We also believe that the testimony of these four witnesses, together with that of others, indicates that the alleged practice had been employed for a sufficiently long period of time that it was no longer a mere experiment or theory. Gerlinger testified that he first took note of the humidity danger in 1917, and that the

development of the practice had been a "progressive" one. At first his company familiarized itself with weather conditions through information supplied by the weather bureau. In 1926 or 1927 it installed a humidity machine. Osborne, to whose testimony we have previously referred, swore that hygrothermographs "had been used by the weather bureau for a good many years but we have used them on the protection work since 1922 or 1923". The testimony indicates that in the forest lands of western Oregon numerous fire wardens, supplied with weather information, served. Some of these possessed hygrothermographs. One of them was stationed at the site of the defendant's logging operations. He, however, possessed no humidity machine. These wardens were connected with a central headquarters by telephone and distributed to logging operations the weather information given to them by their headquarters. According to testimony, the superintendent of the defendant's operations, on the morning of September 6, 1929, was notified in this manner of low humidity. The proof, in our opinion, was sufficient to show that the practice was no longer a mere experiment.

It seems unnecessary to cite authorities holding that such an industrial practice is admissible in evidence, but, in view of the fact that the defendant's brief devotes many pages to an argument that the court erred in receiving this testimony, we shall review briefly some of the many authorities which can readily be found sustaining the admissibility of this character of evidence.

This court has six times spoken upon the subject of an established industrial practice and of its effect in actions where the plaintiff claims that he was damaged through failure of the defendant to exercise due care. In *Willis v. Lance*, 28 Or. 371 (43 P. 487), the

plaintiff charged the defendant with having negligently set a fire which damaged the plaintiffs' property. From the decision we quote:

"The plaintiffs' action, being founded in tort, precludes the defendant from proving the existence of any custom or usage to excuse his alleged negligence."

In other words, custom cannot justify negligence. In *Pointer v. Klamath Falls Land Co.,* 59 Or. 438 (117 P. 605, Ann. Cas. 1913C 1076), the plaintiff was the driver of a four-horse team, and while standing upon the vehicle and driving was injured. The defendant alleged that the driver's position was a negligent one. From the decision we quote:

"We are inclined to think that the testimony of skilled drivers as to the proper and customary position of a driver, under the circumstances detailed, is admissible."

In *Richardson v. Klamath S. S. Co.,* 62 Or. 490, (126 P. 24), this court held erroneous an instruction of the trial court which stated that if the plaintiff, a longshoreman in defendant's employ, was pursuing the customary method of handling the lumber at the time the injury befell him, he could not be guilty of negligence. The decision states:

"The custom of handling it in that way would not excuse him or exonerate him from the charge of contributory negligence."

The decision held, however, that the court did not err in admitting evidence showing the customary method employed by longshoremen in handling lumber.

From *Myrtle Point Transp. Co. v. Port of Coquille River,* 86 Or. 311 (168 P. 625), we quote:

"A party is not to be excused from negligence on the ground that others are in the habit of acting negligently. * * * When there is no absolute standard

of care fixed by law, evidence of what is usual is often of value in assisting a court or jury in determining the issues on a charge of negligence."

In *Oregon Box etc. Co. v. Jones Lumber Co.*, 117 Or. 411 (244 P. 313), this court said:

"Sawmills are not permitted to cast their refuse in the streams. The disposition of such refuse by burning is so common that we can take notice of it. It is the general way employed in this state for disposition of the sawdust and other refuse about sawmills. It is the usual method. One cannot be said to be guilty of negligence who conducts his business in the customary, ordinary and usual manner in which the business is conducted in the same locality or place."

The sentence last quoted, upon which the defendant much relies, misstates the principle of law with which we are now concerned. In writing that sentence we overlooked *Richardson v. Klamath S. S. Co.*, supra. In *Hise v. City of North Bend,* 138 Or. 150 (6 P. (2d) 30), we pointed out the above error and reviewed the authorities which, in our opinion, stated the principle correctly. In addition to the authorities there cited, see also the excellent reasoning in *Ault v. Hall,* 119 Ohio St. 422 (164 N. E. 518, 60 A. L. R. 128); *Sprecher v. Roberts,* 212 Wis. 69 (248 N. W. 795); *MacDougall v. Pennsylvania Power & Light Co.,* 311 Pa. 387 (166 Atl. 589); *Cameron v. Whitington* (Tex.) 280 S. W. 527.

Wigmore on Evidence (2d Ed.), § 461, not only presents a persuasive argument in support of the admissibility of evidence indicating trade and industrial practices but also shows the fallacy of reasoning of the decisions holding it inadmissible. This evidence, according to Wigmore, does not establish the standard of conduct as an item of substantive law, but is merely an item of proof indicating "the tendency of the thing in question". The tendency of the thing now in ques-

tion is the likelihood, or its absence, of fire arising when logging operations are conducted in periods of drouth. *Cameron Compress Co. v. Whitington* (Tex.), 280 S. W. 527, was an action against a warehouseman. The plaintiff alleged that, through the bailee's negligence, the stored items were destroyed by fire. The court held that no error was committed in receipt of evidence of warehouseman's practice to install automatic sprinkler systems to minimize fire hazard. *Sprecher v. Roberts,* 212 Wis. 69 (248 N. W. 795), was a personal injury action in which the plaintiff claimed that the defendant was negligent in not having secured against falling a ladder which it had erected. The court held that evidence of a trade practice to secure ladders was admissible for the purpose of showing the tendency of unsecured ladders, but held that error was committed when the trial court charged that a failure to comply with the custom constituted negligence. *Ault v. Hall,* 119 Ohio St. 422 (164 N. E. 518, 60 A. L. R. 128), was a malpractice case. The defendant-surgeon omitted the removal of a sponge which he had placed in the incision. In justification, he submited uncontradicted testimony showing that hospitals furnish for operations sponge nurses whose duty it is to make the necessary counts, and that such a nurse was present and on duty when the operation was being performed. The court held that the evidence was admissible ''as matter proper for the consideration of the jury in determining whether or not sufficient care has been exercised'', but that it did not, of necessity, establish the exercise of due care by the surgeon. *MacDougall v. Pennsylvania P. & L. Co.,* 311 Pa. 387 (166 Atl. 589), was a personal injury case. The plaintiff, a workman, had been injured through the alleged negligent failure of the defendant to properly install a fuse box. The court

held that proof of the customary manner in which fuse boxes were installed was admissible, but that conformity to practice did not, of necessity, constitute a defense. *Northern Alabama Ry. Co. v. Mansell,* 138 Ala. 548 (36 So. 459), was an action based upon a charge that the deceased had met his death through the defendant's alleged failure to properly construct a stock gap. The court held that no error was committed in the receipt of evidence of the usage of other well-regulated railroads, and that such usage was "evidential of what, in the exercise of due care, ought to have been done". *Frankford & B. T. Co. v. Philadelphia & T. R. R. Co.,* 54 Pa. 345 (93 Am. Dec. 708), was an action based upon a charge that the defendant's negligence had caused the plaintiff's bridge to be consumed by fire. The court held that evidence was properly received showing the use of spark arresters, similar to the defendant's on other railroads "not as a rule of decision but as a matter of evidence, assisting the jury to judge what sort is ordinarily safe". *Kelly v. Southern Minnesota Ry. Co.,* 28 Minn. 98 (9 N. W. 588), was an action wherein the plaintiff claimed that, through the defendant's negligent construction of a railway crossing, plaintiff's horse was killed. The court held that evidence of a prevailing practice concerning the construction of crossings was properly received. We quote:

"The degree of care which was required of defendant in maintaining these crossings, being that which men of ordinary prudence would usually exercise under like circumstances."

*Pittsburg S. & N. R. Co. v. Lamphere,* 137 Fed. 20, (69 C. C. A. 542), was a personal injury action in which the plaintiff, a brakeman, claimed that he had sustained an injury through the defendant's failure to erect warning tell-tales at bridge approaches. The

court held that evidence of the practice of other railroads in regard thereto was admissible, declaring that if such testimony were excluded employers would be left "at the mercy of a variant or perhaps capricious judgment of a jury". For citation to other authorities see Wigmore on Evidence (2d Ed.) § 461, and 45 C. J., Negligence, § 87, p. 706.

It would be strange if logging had not developed practices concerning fire hazard, inasmuch as this hazard is a factor with which the logger is compelled to cope in the summer months. It is evident from the testimony of the witnesses above reviewed that logging has developed a practice concerning this danger, and that the practice recognizes low humidity, especially when a wind is blowing, as a fire hazard for concerns which create friction sparks. Manifestly, the practice aims to minimize fire danger. If an observer were present in the forest and noticed that the swiftly-moving chains, chokers, and cables produce, from time to time, friction sparks which are projected into the surrounding debris, and then observed that all operations ceased when the humidity declined below 30 per cent and the wind began blowing, he quite likely would infer that the operations were suspended because logging experience had taught those in charge that they could not be safely conducted under the weather conditions that had arisen. In other words, the decline in the humidity and the accelerated wind velocity gave notice of fire danger which the loggers heeded by suspending operations. The prevailing logging practice described by these four witnesses, therefore, not only proved that the defendant's conduct on September 6, 1929, in resuming operations after the noon hour, was one that involved grave danger of causing a forest fire, but also showed that the only known means of protect-

ing the forest lands from such a fire at times of low humidity was the cessation of operations. In other words, it showed the character of the defendant's act. It was necessary for the plaintiff to prove that the defendant's act in resuming operations Friday at 1 p. m. violated the precept of due care. Because this testimony helped to prove this needed element, we believe that it was admissible.

■ The last of the aforesaid three assignments of error, based upon rulings made in the receipt of evidence, challenges a ruling which permitted one Carl C. Scott, secretary of the Clackamas and Marion Counties Fire Patrol Association, to testify upon rebuttal: "During periods of low humidity the wardens either call the operators, some of the operators call in to the stations, some of them call me direct here in Portland and get weather reports, predictions as to future weather, and wardens advise with them as to the advisability of continuing operation * * *. This information is given to all of the operators in our district upon request, and if the information is not requested, if the wardens can get them on the 'phone they call them and tell them what the humidity and weather conditions are supposed to be from the latest weather reports and from the indications of the humidity instruments." Defendant claims that this answer violated the rule against hearsay testimony. In the presentation of its case in chief, as we have seen, the plaintiff showed that operators of logging camps keep themselves advised of weather conditions. The defendant, in refutation of this evidence, proved that in 1929 only 17 hygrothermographs had been installed in western Oregon logging camps, although 200 or more camps were in operation. The plaintiff, in rebuttal, presented the above evidence for the purpose of showing that the loggers were not

dependent solely upon the hygrothermographs. It will be observed that the witness merely described the course of conduct of fire wardens during periods of unfavorable weather. Their course of conduct was a part of a practice devised by the fire association. The witness did not repeat the words of any other person nor give their substance. We do not believe that the defendant's objection possesses merit.

The assignments of error which we shall now consider are predicated upon the findings of fact entered in the circuit court. Since these several assignments of error present substantially the same legal issue, we believe that all of them can be conveniently considered together.

The first of these findings declares that after the fire had originated upon the defendant's premises it spread to the plaintiff's lands and consumed property there to the damage of the plaintiff. The second declares: ''Defendant was negligent in its control, use and occupation of the timber and forest lands in its possession, and upon which it was conducting logging operations on and prior to September 6, 1929, in the following respects: * * * Defendant created a fire hazard by the accumulation of slashing resulting from its logging operations upon said lands prior to October 1, 1928, and failed, refused and neglected to burn said slashings and the inflammable debris resulting at any time prior to September 6, 1929; and defendant was not relieved from the obligation to burn such slasings by the state forester. Said condition of slashing augmented the fire which began September 6, 1929, immediately after said fire started, and proximately caused said fire to attain such proportions that it could not be extinguished or controlled or prevented from spreading to the lands of plaintiff * * *.''

The findings further declare that defendant, September 6, 1929, continued its operations, especially Skidder Number 1, "when during said time and at said place a condition of unusually low humidity prevailed and the lands under defendant's control were extremely dry and in a highly inflammable condition, and immediately adjacent to said operation a large area of defendant's lands was covered by unburned slashing, brush, debris and refuse, all highly inflammable. All of said conditions were known to defendant and defendant was given notice and warning of the unusual fire risk resulting in time to have discontinued operation before fire started. As a result of the continuance of said logging operation by defendant in the condition and circumstances then prevailing, and by reason thereof a fire was caused to start which could not be controlled". The next finding which the defendant attacks declares: "No condition of unburned slashing existing on September 6, 1929, or thereafter, while said fire continued on the premises of plaintiff * * * contributed to the damage caused to the property of plaintiff * * *." The next challenged finding states: "Plaintiff, Silver Falls Timber Company, exercised due care and diligence in attempting to extinguish and to prevent the spread of the fire upon its property and to prevent the damage and destruction resulting from said fire * * *." Defendant's attack upon the findings also states that the court erred in refusing to render findings "as to the date and source of origin of each fire, the progress and operation of said fires, the dates or approximate dates when the major losses occurred to the plaintiffs", and that it erred in refusing to find: "No fire was communicated to the Silver Falls Timber Company's property from defendant's fire, except that said fire ran on the ground and in the trees of

sections 4, 5 and 6, 8 South, 3 East, which fires were extinguished by defendant * * *; that the fire in section 15, 8 South, 2 East, on the Silver Falls property originated prior to the start of the fire on defendant's property * * *. That at the time said fire in said section 15 was discovered by the Silver Falls Timber Company no smoke or debris from any fire originating on defendant's premises was going over said section 15.''

We deem it unnecessary to set forth again a consideration of the needed particularity with which the findings of fact must determine the issues. This court has many times pointed out that findings of fact must state the facts of all material issues presented by the pleadings, but that the facts which must be set forth, are the ultimate and constituent facts rather than the probative ones. Although a court may, in addition to stating the ultimate facts, state the collateral ones, it need not do so. Recent decisions to the above effect are *Thiering v. Gage,* 132 Or. 92 (284 P. 832); *Fitzpatrick v. Sletten,* 117 Or. 173 (242 P. 1114); *Maeder Steel Products Co. v. Zanello,* 109 Or. 562 (220 P. 155); *Oregon Home Builders v. Montgomery Inv. Co.,* 94 Or. 349 (184 P. 487), and *Turner v. Cyrus,* 91 Or. 462 (179 P. 279). The findings, in our opinion, state the ultimate facts of every issue presented by the pleadings. The details of time, place, etc., mentioned in the defendant's criticisms would have converted the findings into narratives of the evidence. We, therefore, believe that the facts are stated in the findings with sufficient particularity, and conclude that this portion of the assignment of error reveals no merit.

Upon an appeal from a judgment based upon findings of fact, this court is not at liberty to ignore the findings if they are supported by competent, substan-

tial evidence, even though our examination of the record persuades us that the conclusions should have been otherwise. This rule has been announced too many times to require its restatement to be accompanied with citation of authorities. Accordingly, as we proceed, we shall not pause to weigh the evidence, nor even to mention the defendant's side of the controversies, but shall merely undertake to determine whether the above challenged findings are supported by competent, substantial evidence. We have, however, read with care the transcript of evidence consisting of 4,803 pages and have studied the 200 exhibits.

In order that our disposition of these assignments of error may be understood, we shall now amplify the partial narratives of the evidence which we have already given by mentioning a few additional facts.

The plaintiff's sawmill was located in Silverton. Its timber lands were situated in Township 8 South, Range 2 East of the Willamette Meridian, and Township 8 South, Range 3 East of Willamette Meridian. Its two main logging camps were in the midst of this timber, somewhat south of Abiqua creek and twenty miles or more from Silverton. The site of the defendant's timber camp was north of Butte creek, which runs parallel to and about one and one-half miles north of Abiqua creek. Between these two creeks is a ridge, 4,000 feet high, covered with green timber, known as Crooked Finger ridge. This ridge extends in a general westerly direction through Sections 11, 10, 9, 8 and 7, Township 8 South, Range 3 East, and thence in a northwesterly direction through Sections 12 and 1, Township 8 South, Range 2 East, and Sections 35, 26 and 27, Township 7 South, Range 2 East. September 6, 1929, the plaintiff was conducting its main operations at Camp 14 located in Section 22 of Township 8

South, Range 3 East, but was also conducting some minor operations at Camp 16, located in Section 28, Township 8 South, Range 2 East. These two camps, about seven miles apart, as well as other places in its timber where the plaintiff at times conducted logging operations, were connected with Silverton by plaintiff's logging railroad. Seventeen miles out of Silverton (Section 9, Township 8 South, Range 3 East) the railroad branches into two spurs. The upper spur, eight miles long, on its course to Camp 14 parallels Abiqua creek about a mile south of the creek, while the lower branch takes a zigzag course southerly to Camp 16. The point where the main line divides into these two branches is known as the ''Y''.

September 6, 1929, a large fire known as the Scott fire was burning in logged-off land (not owned by either plaintiff or defendant) about one and a half miles south of Camp 16. It started August 11, 1929, in Section 35, Township 8 South, Range 1 East, but by September 6, 1929, had worked so far northerly that it had either reached the south boundary line of plaintiff's property or had crossed it. On that day the plaintiff lent twelve loggers to the fire association which was fighting this fire. September 6, 1929, a fire which started July 12, 1929, was burning in Section 28, Township 8 South, Range 3 East, on the plaintiff's property. It was known as the Hole fire. It had burned over an area of about 400 acres of slashings. The plaintiff had fought this fire from its inception and two or three times thought it was extinguished, but on September 6 sufficient fire was still evident among stumps and roots that a crew of men was engaged in another attempt to extinguish it. Their efforts continued until Wednesday, September 13, 1929. September 6, 1929, one of the plaintiff's logging trains, hauled

by an oil-burning locomotive equipped with a spark arrester in good order, left Silverton for Camp 14, passing the "Y" at about 9 a. m. Shortly thereafter a small fire was discovered about 75 feet north of the track at the "Y" burning in brush and snags upon property which neither the plaintiff nor the defendant owned. It was burning 1,000 feet or so east of the actual "Y".

September 6, 1929, at about 1 p. m., the defendant's fire started. In a preceding paragraph we described the origin of this fire. The testimony there reviewed is not contradicted and warrants an inference that a friction spark started the fire. We have mentioned the evidence which indicates that September 6, 1929, was a warm, dry day and that it had been preceded by an unusually dry summer. On that day a breeze was blowing from the east or northeast. The fire immediately made rapid headway and in less than an hour's time, running westerly, reached the 400 acres of 1928 slashings. Shortly after the defendant's fire started, a large column of smoke arose. The following excerpts taken from the testimony of several of the witnesses are descriptive of the smoke column: "The smoke apparently was possibly 2,000 feet in the air, spread out in a fan shape." "A big cloud of smoke boiling up." "A great column of smoke arose straight in the air and then drifted off to the right." "A big, black smoke and then—a roar." "A big cloud of smoke rising up and tipping over." "I thought it was a thunder head coming up." "It was a dense, heavy column of smoke that was rising very high, mushroomed out and fanned off to the southwest." "Just boomed right straight up in the air." We shall not mention the testimony of the others who described the smoke except that of one who testified that after the column "tipped

over'' it spread out ''over a mile and a half wide''. All of plaintiff's witnesses who testified upon the subject swore that when the fire reached the 1928 slashings it burned with increased fury. We quote the following taken from the testimony of one of these witnesses: ''When she hit that she just seemed to blow up like gasoline.'' Some of these witnesses described the roar of the fire as it swept into these slashings as explosion-like. The conduct of A. McEachern, defendant's logging superintendent, in declining to send a crew of men into the slashings ahead of the oncoming flames and build a fire trail there indicates the intensity of the blaze. He swore that he refused to do so because the men ''would think I was crazy; they would want me to go in there myself''. The fire, according to the witnesses, soon created a draft which, in turn, increased the fury of the flames. One witness testified that the fire ''caused a pretty good breeze'' and another observed that it created ''a pretty good wind in short order''. McEachern testified that ''the fire creates a wind''. Witnesses testified that the fury of the flames and the accompanying draft threw fire ahead which created spot fires. One of them thus described it: ''It was setting fire quite a little ways ahead, throwing chunks.'' One of the defendant's timber fallers who, due to the rapid progress of the fire, experienced difficulty in getting out of the woods to a place of safety three-fourths of a mile ahead, testified that the fire ''throwed spot fires ahead of us'', and swore that the embers ''were blown right over our heads''. The fire warden on defendant's property, who was at his post of duty about one mile west of the origin of the fire, testified that the approaching fire ''was spotting fire all around me * * * the wind was blowing stuff over that was afire, and was dropping it where it was

unburned; when it would start to burn". This witness, as well as others, testified that the fire and whirlwinds which it created tore blazing material from snags or slashings and carried them off as embers. For instance, one testified: "I noticed a big, tall snag was burning and a whirlwind got it and tore chunks of bark off it as large as a man's body and took them out through the air in a westerly direction."

Substantial evidence indicates that after the column of smoke reached a height of 2,000 feet or more it drifted in a southwesterly direction over the west portion of plaintiff's property, broadening out and assuming a fan shape as it proceeded. A number of witnesses who were under this cloud of smoke at various places, three or more miles from the fire, swore that they observed charred twigs, moss, bark and other forest materials dropping from the smoke for two or three hours after it came overhead. Some of them caught twigs which were sufficiently warm that they could not be retained in the hand, and others observed that the ground was almost covered with ashes and charred materials. One of them testified that he caught a piece of burnt bark "as large as your hand", another, "a fir bough as large as a lead pencil". Still other witnesses testified that spot fires developed under this smoke cloud, for instance, a fire warden, stationed at a lookout place about six miles southeast of defendant's camp, testified that he observed "a number start up in line with the smoke". A farmer, about four miles northwest of defendant's camp, testified that he could "see fires ahead of the smoke underneath of it coming up the ridge. Little fires would start along underneath the smoke like". One of plaintiff's employees working near the "Y" about five or six miles from the fire, testified that he not only saw material drop from

the smoke to the ground but also saw a piece of this material start a fire.

We shall now relate briefly from the plaintiff's evidence a description of the start of the several fires on or closely adjacent to the plaintiff's property which, according to the complaint, damaged plaintiff's property in the course of the two weeks period beginning September 6. The plaintiffs, of course, claim that these fires were started by embers which dropped from the aforementioned smoke cloud. The defendant claims that they were started by sparks from the plaintiff's locomotives or by embers from the aforementioned "Y" or Scott fires. Friday, September 6, at about 1 p. m., Butler, plaintiff's camp foreman, left Camp 14 on a covered Ford speeder to go through the "Y" and on to Camp 16. He reached a point known as Old Eight, about half way between Camp 16 and the "Y", at about 1:30 p. m., and waited there a moment for train orders. He testified that while telephoning he observed the smoke from defendant's fire rising over Crooked Finger ridge, and described it as "a big cloud of smoke boiling up, black smoke". In a moment, he resumed his trip towards the "Y" but was forced to abandon his speeder about a mile before he reached that point because the "Y" fire, which had spread over an area of 30 acres, was so close to the track that he thought the speeder's gasoline tank would become ignited. Having abandoned his speeder, he made his way on foot around the "Y" fire and, after obtaining another speeder, resumed his trip to Camp 16. As he approached Section 15, Township 8 South, Range 2 East, through which the track extends on the way to Camp 16, he observed a fire 30 to 50 feet in diameter burning in the brush of this logged-off section. Butler did not state the hour, but a comparison of circum-

stances apparently leads the defendant to the belief that he reached Section 15 at about 2 p. m. Butler was apparently the first person who saw this fire. According to him it was burning in the part of Section 15 which lies between the upper and the lower tracks which at that place are about 4,000 feet apart, and was about one-half mile or more southeast of the enlarged "Y" fire. Another witness thought the fire was about 700 feet east of the lower track. Butler was not sure whether defendant's smoke cloud was overhead when he saw this fire, but stated that he noticed no debris falling from the sky at that time. He later added, however, that he was riding in a covered speeder. Thirty minutes later, after he had reached Camp 16, he again took note of defendant's smoke cloud and swore that it "was spreading wider and was drifting over that way". He also swore that "I saw pieces of bark, black charcoal and twigs" falling to the ground. The Section 15 fire was upon a direct line between Camp 16 and the place of origin of defendant's fire. About 4 p. m. he started upon his return trip to Camp 14, and as he approached Section 15 again saw the Section 15 fire which, according to him, was now "quite a little bigger". About the same time he noticed a fire burning near the center of Section 16 which adjoins Section 15 on the west. This fire was approximately a mile from the Section 15 fire and about three-fourths of a mile west of the lower line of plaintiff's railroad. Section 16 is owned by neither the plaintiff nor the defendant. Butler continued on his way and at about 5:30 p. m. observed a fire burning a little southwest of the center of Section 12, Township 8 South, Range 2 East, in snags standing upon a rocky projection of Crooked Finger ridge. This property which is one and a half miles north of plaintiff's railroad is not

owned by either plaintiff or defendant. I. L. Stewart, a locomotive engineer in the plaintiff's employ, testified that at about 3:45 p. m., while operating a train through Section 15, he observed a fire there and expressed the belief that "it had just started", adding that "it wasn't over 40 or 50 feet around". He swore that large volumes of smoke were then drifting overhead from which "leaves, ashes and bits of charcoal" were dropping to the ground. He estimated that this fire was about 2,000 or 3,000 feet from the upper track. A half hour later, upon his return trip, he noticed that this fire had grown considerably in size. He testified that at about 4:20 p. m. he observed the Section 12 fire, and stated that it looked at that time as though fire "had lit in the top of a snag". A fire warden stationed at a high lookout point about eight miles west of Section 15 testified that he discovered a smoke column rising from Section 15 at 3:15 p. m. and that defendant's smoke cloud was then over that section.

Saturday, September 7, at 6 a. m., such a large volume of smoke was drifting across the property of one P. W. Meyer on Crooked Finger ridge (Section 1, Township 8 South, Range 3 East) that he and his family hastily left, fearing that fire was near at hand. Meyer's property is about two and one-half miles southwest of the spot where defendant's fire started. When Meyer reached a place on Crooked Finger ridge known as Bucket camp (Section 35, Township 7 South, Range 2 East) a mile north of his cabin, he encountered fire on both sides of the road. Monday, September 9, fire was within 300 feet of his cabin, and on Tuesday the cabin burned. Saturday evening, September 7, a fire was discovered in second-growth timber in the northwest quarter of the northwest quarter of Section 10, Township 8 South, Range 2 East, about a half mile

north of plaintiff's upper line railroad, and about one-half mile northeast of the "Y" fire. We shall call this fire the Long Siding fire. Sunday evening, September 8, fire was burning on both sides of plaintiff's track one-half mile east of the place of origin of the "Y" fire. This was apparently an extension of the "Y" fire. Monday evening, when a strong wind was blowing from the northwest across the Section 12 fire, fire was discovered at a point alongside of plaintiff's railroad known as Nineteen (one and one-half miles southeast of the Section 12 fire). Plaintiffs believe embers from the Section 12 fire ignited the Nineteen fire. About the times these various fires were discovered locomotives of the plaintiff were in operation. Plaintiff's witnesses testified that their locomotives burned oil as fuel and were equipped with adequate spark arresters free from defects.

Evidence presented by the plaintiffs tends to show that (1) the "Y" fire did not proceed materially either south or east into the plaintiff's property, but burned in a large area north and west of the "Y"; (2) the Sections 15 and 16 fires shortly united and then swept south as far as Camp 16 and east as far as Nineteen; (3) the Sections 15 and 16 fires, after merging and moving easterly, united with the Nineteen fire and then continued still farther east until they had virtually circled Camp 14. In the area swept by this great conflagration, lasting for about two weeks, was green timber, trestles, logging railroad equipment, camp buildings and other similar property. There was also located in this area upon plaintiff's property about 60 acres of 1928 slashings at one place, and 70 to 100 acres of 1928 slashings at another. Possibly the quantities were greater. The plaintiff, in violation of § 42-421, Oregon Code 1930, failed to destroy these

slashings before the close of the 1928 season. These slashings were burned some time during the course of the conflagration, but, since no one saw them consumed, we have no account of what took place when the fire reached them.

We come now to a statement of the efforts made by the defendant and the plaintiff to extinguish the fire. Immediately upon the outbreak of the fire upon the defendant's property, it assigned its crew of 164 men to fire-fighting duty and shortly augmented this crew with 105 men brought from Portland. These men, working long hours each day, saved the defendant's logging equipment from the blaze and built 30 miles of fire trail extending from the defendant's camp, across Crooked Finger ridge, through the aforementioned Section 12, and into the plaintiff's property. Most of these men continued at their work for about two weeks until the fire was somehow extinguished. September 6, 1929, at 10 a. m. when the humidity fell to 30 per cent, plaintiff suspended all operations except the running of its trains. Its crew at Camp 14 consisted of 211 men and at Camp 16 were 25 construction men. When the ''Y'' fire was discovered plaintiff dispatched to that point a section crew of about ten men who worked there several days protecting the track. September 6 it sent twelve timber fallers from Camp 14 to the fire association which was endeavoring to protect plaintiff's property from that fire. Apparently these men did not return to the plaintiff for a week or more. For some time one of the plaintiff's crews, consisting of about ten men, had been fighting the fires smouldering in the stumps and roots of Section 28, Township 8 South, Range 3 East, known as the Hole fire. This crew was withdrawn just before the main fire reached that point. When the Sections 15 and 16 fires were dis-

covered a locomotive, tank car and a small crew of men were sent to Section 15. They removed brush near the trestles, wetted down the bridges and ties, and in other ways sought to control these fires. It will be recalled that to the northeast of the Section 15 fire was the plaintiff's upper line, and that to the southwest was the lower line. Plaintiff's witnesses testified that they endeavored to use these two rights of way as fire trails to prevent the fire from sweeping eastward. Plaintiff's foreman testified that the Section 15 fire was burning in "a lot of snags and there was nothing you could do with trail work in there. A thousand men in there couldn't have got a trail in there, and I figured all we could do was to protect our bridges and use our railroad track for a fire line". Another of plaintiff's officials described the area in which the Section 15 fire was burning as "the worst snag formation that we have on our whole operation". Burning snags scatter fire. The Long Siding fire, like the Section 16 fire, did not originate upon plaintiff's property but when it had worked its way southwesterly and had there encroached upon the plaintiff's property, a locomotive, tank car and a crew of men were assigned to the task of extinguishing it. Monday afternoon, September 9, this fire was stopped. The Section 12 fire, as we have also seen, did not originate upon the plaintiff's property. One of plaintiff's officials testified that shortly after this fire was discovered the superintendent of the aforementioned fire association assured him that the association would undertake the fighting of this fire and that he, therefore, did not send any men into that area. The plaintiff's only claim in regard to the Section 12 fire is that an ember was blown from it to Nineteen where a new conflagration was started Monday night which subsequently de-

stroyed much property. When the fires were discovered at Nineteen the plaintiff promptly sent a crew of about 200 men to that point from Camp 14. These men at once proceeded with the construction of trails, but were withdrawn Wednesday evening when the three successive trails which they had built were crossed by the fires. Saturday afternoon (September 7) a large portion of the crew at Camp 14 went on the plaintiff's train to Silverton and did not return to Camp 14 until Sunday night. Wednesday night, after the crews had been withdrawn from the the Hole fire and from building trails at Nineteen, three-fourths of the men were discharged, leaving at Camp 14 about 60 men. Plaintiff's superintendent explained the reason for discharging the major portion of his crew while the fires were raging, as follows: ''I didn't see any possibility of stopping the fire with the weather conditions that existed then. I had probably 175 men at Camp 14. I didn't have any particular supply of provisions there. My railroad was cut off between * * *.'' The evidence shows that the destruction of some of the trestles between the ''Y'' and Camp 14 rendered impassable about two miles of the track serving Camp 14. No highway or other means of approach served this camp. This witness further testified: ''I said that I couldn't use these men to any particular advantage, and that we were in rather a desperate situation there if the fire came up to us. I had more men than I could use to advantage, and I didn't want to have them on my hands if we became cornered, as it looked as though we were going to. Some of these men were old and some of them young, youngsters; there was more responsibility in these men than I wanted to carry, the way conditions looked at that time. * * * We kept all of the men that we could see any possibility of using to

any advantage." The men who remained at Camp 14 proceeded with the construction of fire trails and the performance of other protective work to save plaintiff's property.

Fires burned upon the lands of the plaintiff and of the defendant for two weeks following September 6 before they were extinguished. While much of the logged-off land of both the plaintiff and the defendant was swept by the blaze, and some of their green timber was damaged, virtually all of the green timber on Crooked Finger ridge which separated the plaintiff's operations from those of the defendant was untouched by the flames. Most of this timber was owned by the plaintiff and is about two miles wide and several miles long. The only portion of the Crooked Finger ridge which was badly burned is west of the plaintiff's timber and in the vicinity of Meyer's cabin, Bucket camp and Section 12. Upon the exhibits, consisting of photographs and relief maps, it seems possible to trace a course of fire westerly from the defendant's property and then southerly through Bucket camp, Meyer's cabin, Section 12 and into the logged-off property of the plaintiff.

The record contains no suggestions whatever as to possible causes of the Nineteen, Long Siding, Section 12, Section 15 and Section 16 fires except (1) an ember from the defendant's fire; (2) sparks from locomotives; or (3) an ember from the "Y" or Scott fires. We pause to mention the fact that witnesses testified that loggers are not permitted to smoke while working in the woods, and that Section 42-427, Oregon Code 1930, provides that it is a misdemeanor to throw lighted tobacco upon any forest land during the closed season. Because of these circumstances and the fact that the defendant makes no suggestion that a careless smoker started the

fires just mentioned, we assume that we may dismiss him as a possible cause.

Let us now determine whether the testimony to which we have adverted constituted competent, substantial support for the attacked findings. The first of these findings is the one which states that fire spread from the defendant's land to the plaintiff's. In contesting this finding, the defendant seems especially confident that the evidence fails to show that the Section 15 fire was started by an ember which had emanated from the defendant's fire. It draws attention to the testimony of Butler. It is true that this witness was not sure whether the smoke column was overhead in Section 15 when he passed through that area, and it is likewise true that he testified that he did not notice any falling embers when he observed the Section 15 fire. We should recall, however, that he was in a covered speeder which may have interfered with his vision. From the testimony mentioned in a previous paragraph it will be recalled that Stewart, like Butler, saw this fire when it was about 40 feet in diameter. Stewart saw it from the upper line and Butler from the lower. Since both of these men described the fire in the same dimensions, the conclusion seems warranted that they must have seen it at about the same time. Stewart was positive that the smoke column was overhead when he observed the fire and swore that debris was falling in large quantities at that time. Other members of this train crew also saw falling debris, and some of the members of the fire crew working at the ''Y'' a mile away observed embers dropping at about 2 p. m. While it is true that the estimates made by Butler of the time he consumed in passing from place to place seem to warrant a belief that he arrived in Section 15 shortly after 2, and while it is true that Stewart

says he observed the Section 15 fire at about 3:15 p. m., both witnesses may have been mistaken in their estimates. Butler did not start upon his return trip until 4 p. m., and this late departure possibly indicates that he reached Section 15 later than 2 p. m. Be this as it may, the trial judge apparently accepted Stewart's positive testimony in preference to Butler's negative testimony, and we are unable to say that a legal error was committed in so doing. We thus have testimony that when the Section 15 fire began the smoke from defendant's fire was overhead and embers were dropping from it. But in assailing the finding that the fire which burned plaintiff's property spread from defendant's, the defendant draws attention to the fact that while the Section 15 fire started only a half mile or so southeast of the ''Y'' fire the distance from the Section 15 fire to the defendant's fire was about five miles. It argues that it is as reasonable, if not more so, to believe that the Section 15 and Section 16 fires were started by an ember from the ''Y'' or Scott fires or by a locomotive spark as to believe that they were started by an ember from the defendant's fire. It believes that the ''Y'' fire ran easterly along the plaintiff's right of way, igniting the Long Siding fire as it proceeded, and that it finally reached Section 12. It contends that there was no fire in Section 12 until the ''Y'' fire reached that point Tuesday or Wednesday. In presenting its argument that the aforementioned finding is not supported by evidence, the defendant calls attention to the familiar rule which requires the plaintiff, in cases like this, to distinguish the cause for which the defendant was responsible from all other possible causes and prove that it, and not the others, caused the loss. This rule undoubtedly is applicable to our present case. We shall now under-

take to determine whether the evidence negatives loco-
motive sparks and embers from the "Y" or Scott
fires as possible causes of the Sections 12, 15 and 16
fires. As before stated, plaintiff's locomotives burned
oil and, according to plaintiff's evidence, were equipped
with spark arresters which were nondefective. But
the defendant argues that the fact that the "Y" fire
started within 75 feet of plaintiff's track a half hour
after one of plaintiff's locomotives passed the point
proves that (1) the arrester was defective; and (2)
that a locomotive spark ignited that fire. However,
this fire may have been started by a thoughtless mem-
ber of the train crew, by an occupant of one of the
cabins near the "Y", or by a user of the road near
the point where this fire started. Hence, the circum-
stance upon which defendant relies does not prove that
the spark arrester was defective. We know of no case
which holds a locomotive, equipped with an adequate
nondefective spark arrester, responsible for the origin
of a fire merely because it passed nearby. However,
it will be recalled that the nearest rail to the Section
15 fire was 700 feet away, that the nearest rail to the
Section 16 fire was about a mile distant, and that the
nearest rail to the Section 12 fire was at least a mile
and a half distant. Such being true, we believe the
circuit court was warranted in dismissing locomotives
as possible causes of these fires.

We come now to a consideration of the possibility
of an ember from the "Y" fire or the Scott fire as
the cause of the Sections 15 and 16 fires. The Section 15
fire was southeast of the "Y" fire, but the Section
16 fire was southwest of that fire. The Section 15 fire
was discovered before the Section 16 fire. Plaintiff's
testimony indicates that on Friday, September 6,
the course of the wind was southwest, and defendant

insists that it was northwest; hence, it would be most unlikely for an ember from the ''Y'' fire to blow southeast. The testimony also indicates that the ''Y'' fire which was burning in salal and occasional small snags was not a hot fire, likely to send embers aloft; at least none of the witnesses mentioned any embers emanating from it. Hence, we dismiss the ''Y'' fire as a possible cause of the Section 15 fire. It is reasonable to assume that the Sections 15 and 16 fires were started by the same cause. The Scott fire was about four miles south of the Section 15 fire, and, since all agree that the wind was not blowing north, this fire must be dismissed as a possible cause of the fires in Sections 15 and 16.

Having dismissed locomotive sparks and embers from the ''Y'' and Scott fires as possible causes of the fires which raged upon the plaintiff's property, we now come to a consideration of defendant's fire as a possible cause. We have neglected to mention that plaintiff's evidence indicates that there were no fires in Sections 12, 15 and 16 Friday morning, September 6. It will be recalled that defendant's fire spread not only upon the ground but also through the air. The evidence shows that smoke from the defendant's fire drifted over the area where the Bucket Camp, Section 12, Section 15, Section 16 and Long Siding fires started; that large quantities of embers dropped from the smoke; that one of these was seen to start a fire about a mile from Section 15 at about the time the Section 15 fire was ignited; that embers from the defendant's fire started many spot fires a mile or so in its advance; that shortly after the defendant's smoke pall reached Section 15 a thin column of smoke was seen to rise from that area, indicating that a fire had started there; that within three hours of the time that defendant's smoke came overhead the Sections 12, 15 and 16 fires had

begun to burn; and that in the aerial photographs areas of timber leading from defendant's property over Crooked Finger ridge into the plaintiff's appear to be damaged and thus indicate that as the smoke drifted southwesterly fires ran under it in almost a continuous course from defendant's to plaintiff's property. In determining whether this evidence proves that defendant's fire was the cause of the fires on plaintiff's property, the law exacts no unusual course of reasoning. In New York much criticized decisions have been announced which arbitrarily refused to allow recovery unless the damaged property was adjacent to the property upon which the fire started. Even though the fire ignited the adjacent property after having first passed it, New York has denied recovery: *Read v. Nichols,* 118 N. Y. 224 (23 N. E. 468, 7 L. R. A. 130). In that case the court said:

"If it could be so held, then however many buildings might be burned if the fire but spread from one building to another the negligent party would be liable to respond in damages to every owner; even if, as in this case, the course of the wind had so changed as to drive the flames and sparks of burning buildings in a direction other than was possible at the moment of the performance of the wrongful act."

For criticism of this decision and of others which arbitrarily refused to allow recovery merely because the two properties were not adjacent or the number of the structures burned was large, see Thompson, Commentaries on Negligence, § 126. We can perceive no difference in principle between holding a tort-feasor responsible for the destruction of a large number of buildings by fire and holding another responsible for inflicting personal injuries upon a large number of individuals. Without citing or re-

viewing the decisions we express the belief that the majority of the decisions do not deny recovery merely because the damage was great, the fire traveled a long distance, or because the properties were not adjacent. The vast majority of the decisions set no arbitrary limitations and resort to no unusual course of reasoning. While no unusual method of reasoning is to be employed in determining whether the defendant's negligence was the proximate cause of plaintiff's loss, it is essential that the evidence prove that defendant's fire was, in fact, the one that ignited plaintiff's property. Whether by direct evidence or by circumstantial evidence, the course of the fire must be traced from defendant's land to the plaintiff's. Evidence that amounts to demonstration, however, is not necessary. "Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind.": § 9-103, Oregon Code 1930. The distance traveled through the air by the embers before they reached Sections 15 and 16 was long, the conflagration itself was great, and the judgment is large. These facts have cautioned us to read carefully the evidence and to study the briefs, but they can not justify any one in failing to yield to evidence the effect which reason assigns to it. In studying the authorities we have encountered several decisions which sustained judgments in favor of parties whose property was situated at a greater distance from the inception of the fire than was the plaintiff's in the instant case. Hence, a distance of five or six miles traveled by fire is not unique. The record includes testimony explaining how it is possible for embers to be carried long distances. Osborne testified that big conflagrations create "convectional currents" which "lift the embers and sparks very high into the air" and that since a very large

fire hurls the embers to great heights their drift is correspondingly longer. We all know from experience in this timbered area that conflagrations of greater magnitude than the present one have occurred several times; hence, the story told by plaintiff's numerous witnesses certainly is not an impossible one. When the story is believed, and it was believed by the circuit court judge, we have creditable proof that defendant's fire sent burning embers to plaintiff's property, and likewise creditable proof that defendant's fire ran through the timber into the plaintiff's property. The defendant suggests that ''even if it could be found that defendant's fire was carried through the air five miles and more and three miles and then set new fires without any intervening ones, then the extraordinary wind which sprang up and carried the fire such distances, and the unheard of tenacity with which brands carried from the Eastern and Western property held their fire long enough to set the new fires would amount to an act of God and an intervening cause sufficient to destroy the causal connection between the Eastern and Western fire and these later fires''. An act of God, according to Shearman and Redfield on Negligence (6th Ed.) § 16 ''implies the intervention of some cause not of human origin and not controllable by human power''. But, as was said by Lord Mansfield in *Forward v. Pittard,* 1 T. R. 31: ''Everything is the act of God that happens by his permission; everything by his knowledge.'' In this broad sense the low humidity, the long drouth, and even the friction sparks were acts of God, but some acts of God are sufficiently commonplace that men are expected to make provision against their occurrence, and hence they are not regarded as intervening causes breaking the causal connection between negligence and its result. In the prac-

tical administration of justice only a development which reasonable prudence and foresight could not have guarded against is deemed an act of God. Our problem, therefore, is not to determine whether the wind that blew on September 6 and the heat that reposed in the embers were the results of God's action, but whether the defendant should have taken into contemplation a likelihood of their occurrence when it resumed operations at the close of the noon hour. The defendant strongly insists that the weather on September 6 was not unusual. McEachern, its logging superintendent, described that day as "just a regular summer day". The defendant does not contend that any extraordinary weather change occurred in the two-week period beginning September 6. The editor of 42 American Law Reports, at page 825, makes the following statement and supports it with a review of many decisions: "It is well settled that the owner of premises who is liable for damage done by the spread of a fire accidentally originating thereon is liable for injury to property to which flames or burning embers are carried by a wind which is of no more violence than such as ordinarily occurs or is to be expected in the vicinity. Such a wind is not an independent intervening cause which will relieve him of liability, but is a factor to be considered by the jury in determining the question whether the burning sued for is a proximate result of the act complained of." From 45 C. J., Negligence, p. 934, § 493, we quote: "If the occurrence of the intervening cause might have reasonably been anticipated, such intervening cause will not interrupt the connection between the original cause and the injury. Under such rule the ordinary forces of nature and condition of the weather, such as cold, heat, wind, or a rainstorm, or snowstorm, which are usual at the time and place, are conditions

which reasonably could have been anticipated, and will not relieve from liability the person guilty of the original negligent act." From *Miami Quarry Co. v. Seaborg Packing Co.*, 103 Or. 362 (204 P. 492), we quote: "But usual and expected conditions of weather and the natural and ordinary action of the forces of wind and water operating on a negligent act, will not ordinarily constitute an independent, efficient intervening cause which will supersede the original wrongful act so as to make it remote * * *." Although we have carefully read the transcript of evidence, we have found in it no mention by the defendant of any weather or other development which was extraordinary. The testimony, except for the single exception which we shall now mention, induces the belief that all things pursued their ordinary course. The defendant's logging superintendent, McEachern, testified that in September of 1929 defendant's operations were entirely surrounded by green timber, at least a half mile thick. While he did not so state, he possibly believed that fire would not burn through this timber into the property of others. However, when he mentioned this subject, August 28, 1929, to the fire warden in answer to the warden's warning that the existing low humidity was producing a grave fire hazard, the warden replied: "If a fire got started during these weather conditions, as dry as it was, with low humidity, just as I said, his fire would not stop in the green timber." September 4, 1929, Ferguson, the district forester and head of the fire association of which defendant was a member, warned McEachern's superior that "conditions were extremely hazardous, that he was taking an awful chance in operating during periods where the humidity was dropping down below 30, that I didn't think they were using due precaution in their operation, that I

didn't think that Mr. McEachern was as cautious about fire as he should be in the camp * * *''. On the morning of September 6 defendant was warned that the humidity had dropped below 30. If this testimony is true the defendant was warned three times in ten days of the existing fire hazard, including a caution that the green timber upon which its logging superintendent relied as a fire stop might fail him. The succession of events which began at the close of the noon hour September 6 demonstrated in dramatic manner that the warnings were well justified. But while the defendant's logging superintendent mentioned the surrounding green timber he did not plead ignorance of the fact that ''crown fires'' carry fire through green timber and that fire also can run along the ground through forests. Likewise, he did not claim to be unaware of the fact that burning embers arise from fires and are carried by air currents to other places. The spread of the fire as described by the witnesses was not due to some extraordinary factor which the logger rarely sees develop, but was due solely to the facts (1) that fires can run through tree tops; (2) that they can run along the ground through the underbrush; and (3) that embers arise from hot fires and drift long distances. The extraordinary size and fury of the fire could have been foreseen. The fire warden and Ferguson foresaw it and warned defendant. The fire of only hat size when it was first seen was burning in materials of such inflammable character that four loggers doing their utmost could not kick it out. Others who came with fire-fighting implements were driven back by the flames, which, fanned by the east wind, raced for the 1928 slashings. When the fire entered these slashings which should have been destroyed twelve months previously, the flames became fiercer,

the smoke became blacker, explosive sounds were heard and the burning embers were carried high in the air. We know of nothing that occurred in the course of these events which should be classed as an independent intervening cause excusing the defendant from responsibility for the fire damage. Without stating further our consideration of the evidence applicable to this finding we state our conclusion that it is supported by competent, substantial evidence.

■ The second challenged finding declares that defendant was negligent in the use of its forest land by permitting slashings to accumulate thereon which it should have destroyed prior to October 1, 1928, and that these old slashings augmented the volume of the fire to such an extent that no one could control it. It will be recalled that § 42-421, Oregon Code 1930, requires: "Every one * * * engaged in logging * * * thereby creating a fire hazard, shall, unless relieved by the state forester, each year remove such hazard by burning his annual slashing * * *. provided that where only a portion of the forest crop is removed and in the opinion of the forester such burning is unnecessary, or will create a fire hazard, he may relieve by written authorization such person, from the above requirements * * *." The defendant admitted that it possessed no written release justifying its failure to destroy all of its 1928 slashings. The testimony of its superintendent that a warden had procured for defendant an oral release from his district forester was contradicted by both the warden and the district forester. We, therefore, conclude that the circuit court's finding that the defendant possessed no release of its obligation to destroy its 1928 slashings was warranted. It will be recalled that evidence produced by the plaintiff strongly indicates that these old slashings greatly

augmented the volume and intensity of the fire. It will also be recalled that defendant's superintendent was so much impressed by the fury of the flames as they raced through the slashings that he branded as "crazy" a suggestion to send men into the slashings for trail building purposes. It is not unreasonable to believe that if these old slashings had been destroyed in 1928 the fire might have been stopped on defendant's property. The record also warrants a belief that if these old slashings had not increased the volume of the fire the burning embers would not have been carried to distances as great as they were. We believe that this finding is supported by competent, substantial evidence.

We come now to the finding which declares that defendant's conduct in operating Skidder Number 1 on September 6, 1929, under the existing conditions, was a negligent act. We have already expressed our belief that the circuit court did not err when it received in evidence the humidity charts which showed that on September 6 the humidity fell below 30 per cent and that it was preceded by a long period of abnormally dry weather. We have also expressed our belief that the circuit court did not err when it permitted the plaintiff to prove that loggers who employ equipment similar to the plaintiffs suspend operations when low humidity combines with another unfavorable circumstance and thereby creates a fire hazard. If the voluminous testimony produced by the plaintiff reveals the truth, there were five dangerous factors confronting the defendant when it resumed operations at the close of the noon hour on that day: (1) low humidity; (2) high temperature; (3) large quantities of slashings, some a year old; (4) wind blowing toward the dry 1928 slashings; and (5) extreme dryness of all forest materials. When defendant resumed operations it knew

that its swiftly-moving equipment would project friction sparks into the dry forest debris. It also knew that if a fire should start its extinguishment would be virtually impossible. The logging practice described by the witnesses indicates that when the defendant resumed operations under the above-mentioned circumstances it became engaged in a course of conduct that logging experience has shown to be dangerous. It is our belief that the circuit court's finding that a resumption of operations which involved the projecting of friction sparks into this dry material is supported by competent, substantial evidence.

■ The next finding which the defendant attacks states that the 1928 slashings on plaintiff's property did not contribute to the damage suffered by the plaintiffs. On first impression it seems unjust to hold that defendant's negligent failure to destroy its 1928 slashings cooperated with other factors in becoming the proximate cause of plaintiff's damage but declined to attach similar import to the plaintiff's. But, as previously stated, the defendant's 1928 slashings were reached before the fire had achieved its greatest proportions. They constituted the fuel, if plaintiff's testimony is truthful, which gave the fire volume and caused it to send burning embers high into the air. But plaintiff's 1928 slashings, which were located in two widely separated places, were not reached until the fire had been burning for three days or more. The record does not disclose what occurred when the flames reached them. So far as we know, plaintiff's damages were neither increased nor lessened by their presence. Since we cannot say that the circuit court's finding is not supported by competent, substantial evidence, we dismiss this assignment of error as lacking merit.

■ The next criticized finding states that the plaintiff exercised due care in endeavoring to extinguish the fire and protect its property from the flames. Section 42-410, Oregon Code 1930, requires every landowner having knowledge of a fire burning upon his land "to make every possible effort to extinguish" the fire, and § 42-411 contains a similar provision. The memorandum decision of the trial judge states: "I think that both companies did all that could reasonably be expected of them toward keeping the fire within bounds, but they were dealing with forces of nature which, once set in motion, it was humanly impossible to control until the damage had been done." The issue of contributory negligence and of defendant's failure to perform its above statutory duty is largely one of fact in this case. We believe that the trial judge's observation that "it was humanly impossible to control" this fire largely disposes of this issue. Since we believe that substantial evidence supports the finding, we are bound by it. The foregoing disposes of all assignments of error based upon the findings.

■ The next assignment is based upon the circuit court's order which denied the motion for a nonsuit. Apart from alleged errors which we have already mentioned, this motion was predicated upon (1) the fact that defendant was at the time of the fire a member in good standing of an approved fire association which had contracted with the state forestry board for the control and suppression of fires upon defendant's lands; and (2) an interpretation of the evidence to the effect that the fire association had taken charge of the fire fighting which was being pursued on defendant's lands.

The latter part of § 42-411, Oregon Code 1930, provides: "If the owner shall regularly pay a fire patrol

assessment on such land and/or is a member in good standing of an organization approved by and under contract with the board, which organization has undertaken the control and suppression of fires on such land, and such organization is actually engaged in the control and suppression of fire entering upon or which may be burning on such land, the owner shall not be liable under Section 10 of this Act (§ 42-410, Oregon Code 1930), or be held as maintaining a nuisance as defined in this section unless he or his agent shall, through negligence or carelessness, be responsible for the origin of such fire.'' Section 10 subjects to fine and imprisonment ''any one who unlawfully sets on fire, or causes to be set on fire, any forest land　*　*　*　or who wilfully or negligently allows fire to escape from his own land　*　*　*''. Even if a conclusion is warranted that the fire association assumed control of the fire-fighting efforts which were being advanced on defendant's land, it will be observed that defendant had negligently permitted the fire to start and, therefore, its membership in the association did not free it from responsibility.

■ The last assignment of error is based upon a contention that the circuit court erred when it awarded to the plaintiffs $12,000 damages as compensation for the plaintiff's loss of the use of its logging railroad during the three-month period following the fire. Since the railroad was useful only to the plaintiff, no evidence of market rental value was introduced, but the plaintiffs contend that if the railroad had been in operation all fixed expenses (taxes, insurance, salaries, etc.), properly chargeable to it, would have been earned, and that, therefore, this sum was recoverable as damages. Plaintiff conceded that it was not earning a profit. In support of the above item of damages and of other

items alleged in the complaint, the plaintiffs offered evidence showing (1) that during the period of three months while the logging railroad could not be operated the fixed expenses properly chargeable to it amounted to approximately $200 per day; (2) that plaintiff had paid $4 per thousand feet for its timber; (3) that the market value of its timber (without taking into consideration the fact that a logging railroad had been built into it) was $4 per thousand feet; (4) that the construction of the logging railroad added an additional value of $1 per thousand feet to the timber; (5) that the plaintiff's account books credited it with the amount of timber shown by its cruises at $2.15 per thousand feet; (6) that if the timber was worth $2.15 only per thousand feet, and if the land contained the amount of timber indicated by the cruises, past experience showed that the plant, during the three-month shutdown, would have earned enough to discharge its operating expenses. It is manifest that an allowance for the value of the use of the railroad can be awarded as damages only in the event that the plant's past experience showed that it would have earned enough in the three-month shutdown period to defray these charges. But it developed that the land was yielding only 64 per cent as much timber as the cruises indicated. Confronted with this development, the plaintiffs argued that the value of the timber was immaterial and that any loss sustained by this capital asset did not prove that the plant was not earning its fixed charges. They contend that any balance left after these overhead charges had been paid represents the real value of the timber. However, we notice that, for the purpose of showing the loss sustained by the plaintiff when its standing timber was burned by defendant's fire, the plaintiff offered the aforementioned proof of the value of the timber.

The findings declare that the damaged timber was worth $77,741 and the judgment includes that amount. Clearly the timber cannot be worth $4 per thousand feet for one purpose and be virtually worthless for another purpose. Since the plaintiff contended that its timber was valuable and recovered a substantial sum of money for all timber destroyed, we are satisfied that in determining the item of damages with which we are now confronted the value of the timber hauled to the sawmill was one of the items which must be taken into account in determining whether the plant was earning its fixed charges. Since the only available proof shows that the aforementioned charges were not being earned, we are of the opinion that the plaintiffs have failed to prove the reasonable value of the use of the railroad. It follows, therefore, that the $12,000 item cannot be allowed, and that the circuit court erred when it included it in the judgment.

■ The above disposes of all of the assignments of error. We have not discussed herein all of the contentions advanced by the parties, nor have we set forth an analysis of every authority cited by them, but we have given to all of their contentions and all of their authorities careful attention. We have omitted mention of many items of proof favorable to the defendant. These omissions have been due to the fact that we are bound by all findings supported by substantial evidence.

The cause is remanded to the circuit court. A new judgment will there be entered for the plaintiffs in the sum of $251,207.75 plus interest from the date of entry. Defendant will have judgment for its costs in this court.

CAMPBELL, C. J., and BEAN, RAND, BELT, KELLY and BAILEY, JJ., concur.